### MARGARET FOLEY et al.

#### *v.*

### EDWIN R. KIRK.

1. To compel the surrender and cancellation of written instruments, which have spent their force and are mere nullities, but which, left in an uncanceled state, may becloud a title, or be used for dishonest purposes, is an ancient and well-established head of equity jurisprudence. A court of equity will assume jurisdiction and compel the surrender of the instrument, or limit its use to such purposes as may seem to it to be equitable, when a suit at law is already pending, if it shall appear that it is doubtful whether the instrument may not be used, in such suit, for a dishonest or inequitable purpose.

2. The question whether a deed was intended, by the parties thereto, to operate as a mortgage or as an absolute conveyance, is one that a common law court can neither hear nor determine. It is a question belonging exclusively to equity tribunals, and over which common law tribunals have no jurisdiction whatever.

3. It is a universal principle that a purchase, at a tax sale by one whose duty it was to pay the taxes, shall operate only as an extinguishment of the tax. One man can acquire no rights against another by a neglect of a duty which he owes to the other.

4. Where a party, lawfully in the possession of land, under a title which turns out to be defective, makes permanent improvements, in good faith, before he has notice that his title is defective, which materially increases the value of the inheritance, and the actual owner afterwards seeks relief against him in equity, relief will not be given except upon equitable terms.

On final hearing on bill, answer and proofs taken before a master.

*Mr. Charles H. Winfield* and *Mr. Peter Bentley,* for complainants.

*Mr. Joseph D. Bedle,* for defendant.

The Vice-Chancellor.

The principal object of the bill in this case is to compel the defendant to surrender, for cancellation, five declarations of sale, which the complainants allege were, long ago, fully paid, and are, consequently without legal force, but which they say the defendant intends, wrongfully, to put in evidence against them on the trial of an action of ejectment, which they have brought against him, and that their production in evidence will very seriously imperil their just rights.

The facts material to the controversy, which are either admitted or so fully proved as to be beyond dispute, may be stated as follows:

Ann Stanton died intestate, in 1843, seized in fee of two lots of land situate in the city of Hoboken. She died without leaving issue, but leaving a husband, and two brothers and a sister. A child was born to her and her husband, which died in infancy, so that, on her death, her lands descended to her two brothers and her sister, subject to an estate by the curtesy in her husband. Her husband, John Stanton, conveyed the lands of which she died seized to his brother, William Stanton, by deed dated July 15th, 1846. William Stanton, after he acquired John's life

estate, neglected to pay a tax of $14.93, assessed against one of lots for the year 1858, and on the 16th of May, 1859, the the proper municipal authority sold this lot to one Ebenezer Montague, for the amount of the tax and costs, for the term of nine hundred years, and issued a declaration of sale. The same lot was again sold, to the same purchaser, for a term of ninety-nine years, on the 30th day of April, 1860, for the tax of the year 1859, and also for a sewer assessment of $64.23. Declarations of sale, in execution of these sales, were also issued. On the same day the other lot was sold, to the same purchaser, for a term of ninety-nine years, for the tax of 1859, and likewise for a sewer assessment of $66.43. Declarations of sale were also issued upon these sales. The total amount of the taxes and assessments for which these sales were made, was $180.42.

Some time in the year 1861, William Stanton applied to one Henry Thomas, who resided at Utica, in the state of New York, to make him a loan for the purpose of enabling him to pay off or purchase Montague's claims under the tax sales. Thomas consented to do so, and afterwards paid Montague $300 in satisfaction of his claim. The amount so paid to Montague was negotiated wholly by Thomas and Montague. Stanton took no part in it, nor was he consulted about it. Prior to this time, Thomas had paid Stanton's debts, advancing a considerable sum for that purpose. Immediately after the sum to be paid to Montague was agreed on, Stanton requested Thomas to accept a mortgage for the whole of his indebtedness to him, including not only his payment to Montague, but also his payments to others. This Thomas declined to do, but insisted on having an absolute conveyance, " so," to quote Thomas's own words, " that I could see that the taxes, the interest, and so on, were paid in the future, but I told him I would give him any kind of a paper that could be drawn, to secure him the property back." Stanton assented to this arrangement, and in execution of it, on the 21st day of January, 1862, conveyed the lots in question to Thomas, by deed absolute on its face; and Thomas, on the same day, executed an agreement, under seal, agreeing to reconvey the lots to Stanton or to his wife, or to any other person he might name, on being

paid his debt.   The agreement provided that Stanton should re-
tain possession of the lots and take their rents and issues, and
pay all taxes, assessments and water rents, and that the interest
on his debt to Thomas should be paid semi-annually, and that
$200 of the principal should be paid at the end of three years,
$200 more at the end of four years, and the balance at the end
of five years.   Two days afterwards (January 23d, 1862), Mon-
tague assigned the four declarations of sale, issued to him April
30th, 1860, to Thomas, and also executed a deed to Thomas for
one of the lots.   This deed states on its face that it was executed
for the purpose of releasing and conveying to Thomas any right
Montague may have acquired by his purchase of the lot at two
tax sales theretofore made by the city authorities, one February
8th, 1858, and the other May 16th, 1859.

On the 24th of November, 1862, William Stanton, by a
writing under his hand and seal, assigned to the defendant all his
rights under his contract with Thomas for a reconveyance of the
lots, and, by the same writing, directed Thomas to convey the
lots to the defendant.   The defendant swears that this assign-
ment was made in execution of a contract he had made with
Stanton for the purchase of the lots, with other lands, at the price
of $7,200, $5,000 of which was the price he had agreed to give
for these two lots.   He further testifies that he fully understood,
when he made the purchase, that the deed made by Stanton to
Thomas was not intended to have effect as a deed, but was meant
to have effect as a mortgage, and that he paid Thomas, in satis-
faction of the debt secured by the deed, out of the purchase-
money he had agreed to pay to Stanton, the sum of $2,580.
Thomas, in fulfillment of his contract with Stanton, and pursu-
ant to the directions contained in the assignment, conveyed the
two lots to the defendant by deed dated January 10th, 1863.
The defendant also testified that the five declarations of sale
issued to Montague, and also the deed made by Montague to
Thomas, were delivered to him with the deed from Thomas to
him, and as parts of his muniments of title.

Henry Thomas is the only person now living who took part in
the transaction of January, 1862, when Montague's tax titles

were paid or purchased, and Stanton executed the deed to Thomas. Montague, Stanton, and the lawyer under whose direction the business was done, are all dead.   Mr. Thomas has been examined as a witness.   He swears that he paid the taxes to Montague for the benefit of Stanton's family ;  that the amount he paid was included in the security he took from Stanton, and that he understood the tax sales were to be canceled at once.

John Stanton, the life tenant, died October 13th, 1877.   The complainants are either heirs at law of Ann Stanton or stand in the title of her heirs.   Shortly after John Stanton's death, the complainants brought an action of ejectment against the defendant, to recover possession of the two lots of which Ann Stanton died seized.   The defendant has appeared and interposed a plea, and in this case he has made no attempt to deny or conceal the fact that on the trial of the action of ejectment, he intends to use the declarations of sale as evidence, and to insist that they, in connection with his other title papers, give him a perfect legal title to the possession of the two lots in controversy, for a long term of years.

To compel the surrender and cancellation of written instruments which have spent their force, and are mere nullities, but which, left in an uncanceled state, may becloud a title, or be used for dishonest purposes, is an ancient and well-established head of equity jurisprudence.   If the instrument was originally valid, but has, by subsequent events, such as satisfaction, or payment, or other extinguishment, become *functus officio*, and the party holding it refuses to surrender or cancel it, the court will compel its surrender, though no present or future use of it, to the prejudice of the complainant, is threatened ;  for, in such case, its mere existence may seriously cloud the complainant's title, by rendering it possible that ultimately it may be used to overthrow his title, when the facts are no longer capable of complete proof, or have become involved in the obscurities of time.   *1 Story's Eq. Jur.* § *705.*   Equity may intervene, even if the instrument is void by matter apparent on its face, and would be so held at law. But it will not arbitrarily or causelessly change the forum of litigation when an action at law is already pending, and ade-

Foley *v.* Kirk.

quate protection can be given in that forum, but if adequate relief cannot be given at law, or the character of the instrument is such that the court can see that, if used in a trial at law, it will be liable to cause embarrassment, or create great uncertainty, or put the party against whom it may be used in great hazard of losing his just rights, it will assume jurisdiction and compel the surrender of the instrument, or limit its use to such purposes as may seem to it to be equitable. All that is required to justify a resort to equity, when a suit at law is already pending, is, that it shall appear that it is doubtful whether the instrument may not be used in such suit for a dishonest or . inequitable purpose. *Hamilton* v. *Cummings, 1 Johns. Ch. 517; Cornish* v. *Bryan, 2 Stock. 146; Metler's Admrs.* v. *Metler, 3 C. E. Gr. 270; Metler* v. *Metler's Admrs. 4 C. E. Gr. 457; Smith* v. *Smith, 3 Stew. Eq. 564.*

There can be no doubt about what will be the line of defence which the defendant will pursue in defending the action of eject-ment. He will insist that the deed from Stanton to Thomas, being absolute on its face, must, according to settled rules of law, be given effect according to its terms, and that its terms, in a common law court, cannot be changed or varied by proof of a parol understanding that it should not have effect as an absolute conveyance, or even by proof of a cotemporaneous written agree-ment to reconvey. He will also insist that as Thomas was never under any duty to pay the taxes and assessments for which the tax sales were made, he had an indisputable legal right, even after he had acquired title to the life estate, to purchase an out-standing tax title, and that such purchase did not enure to the benefit of the remainder-men, nor operate as an extinguishment of the tax title; for such purchase could, in no sense, be charac-terized as an attempt to build up a title hostile to the remainder-men, on his own default. I think it may well be doubted whether the purchase of a tax title, under the circumstances stated, could be regarded in a court of law as a violation of the principle that a tenant for life shall not, by a violation of his duty to pay taxes, be permitted to acquire the estate in remainder. The defendant has an undoubted right in a court of law to stand

in the strength and vigor of Thomas's title, as shown by the title papers. The deed from Thomas to the defendant passed all the rights which Thomas had, whether derived from Stanton or Montague, and in the court that must try the action of ejectment the defendant is entitled to have his right to the possession of the land in dispute adjudged by what is written in his title papers, and not by what the parties to them intended. The question whether the deed from Stanton to Thomas was intended by the parties to be a mortgage, or an absolute conveyance, is one that a common law court can neither hear nor determine. That is a question belonging exclusively to equity tribunals, and over which common law tribunals have no jurisdiction whatever. And so, too, the very important question in this case, whether the money paid by Thomas to Montague for the tax-titles, was the money of Stanton or of Thomas, or was subsequently treated by the parties as the money of Stanton by incorporating it in the debt which the deed was given to secure, is one that the court which must try the action of ejectment cannot hear and adjudge. And yet it is manifest, at a glance, that any judgment respecting the rights of these parties, which is not largely controlled by the solution which these questions shall receive, must fail in the accomplishment of justice. This consideration is decisive, in my judgment, as to the power and duty of this court.

The decisive question, then, on the merits, is, have the taxes on which the declarations of sale were founded been paid, so that the declarations have lost all force as evidences of title? The oral evidence on this branch of the case is free from contradiction. It comes entirely from one source. Mr. Henry Thomas is the only person now living, so far as is known, who can give any information respecting it. He swears, as has already been stated, that he paid the taxes on which these declarations of sale were founded, for the benefit of Stanton's family, and that the amount he so paid was afterwards included in the security he took from Stanton. If this evidence is believed, the declarations of sale possess, in equity, no more force as evidences of title than so many pieces of blank paper. It is true they were not canceled when the taxes were paid, as Mr. Thomas says it was

Foley v. Kirk.

understood they should be; on the contrary, they were transferred to Mr. Thomas. But it is quite clear, I think, that the transfers were not made for the purpose of building up or keeping alive a title hostile to that of William Stanton. Stanton had appealed to Thomas to protect him against a danger which threatened his possession, and Thomas had promised to help him. This put Thomas in a position of trust, where, if he acquired the tax titles, he was bound to hold them for the benefit of Stanton. That, I have no doubt, was his purpose in taking them. The deed and assignments from Montague were simply intended by Thomas to augment and strengthen his security for his debt. This is made conspicuously clear by his agreement to reconvey. That provided, upon being paid his debt, he should reconvey. His deed would, of course, pass his whole estate, whether derived from Stanton or Montague, and all parties were bound to know that the moment Stanton paid the taxes, upon which the declarations of sale were founded, the tax titles were extinguished forever. The evidence, considered as a whole, permits but one conclusion, namely, that Thomas paid the taxes with Stanton's money and took an assignment of the tax titles, not to preserve a hostile title, but solely to increase and fortify his security for his debt.

In this condition of affairs, it is obvious the moment Stanton paid his debt to Thomas, the tax titles became mere nullities. That debt was paid by Stanton in January, 1863. This fact is proved by the defendant's own oath. He says he purchased the two lots in dispute of William Stanton, in November, 1862, for $5,000, and of this sum, he paid to Thomas, in January, 1863, in satisfaction of Stanton's debt, the sum of $2,580. He knew, at the time he made this payment, and also when he made the contract of purchase, that Thomas held the land not as owner, but merely by way of mortgage, and simply as security for his debt. This payment operated as a complete extinguishment of the tax titles. Even if Stanton had intended to preserve the tax titles, and that his payment to Thomas should have effect as a purchase, and not as a payment in extinguishment of the taxes, the law would not permit him to accomplish his purpose, for the

12.

principle is universal that a purchase by one whose duty it was to pay the taxes, shall operate only as an extinguishment. One man can acquire no rights against another by a neglect of a duty which he owes to the other. *Cooley on Tax. 346.*

The declarations of sale must be declared to be nullities, and inasmuch as their production in evidence on the trial of the action of ejectment may unjustly imperil the rights of the complainants, their surrender and cancellation must be decreed.

The defendant, however, insists that such decree should not be made except upon terms. He says when he purchased of William Stanton he believed Stanton held the lots in dispute in fee, and continued to believe so until 1875 or 1876, and that, in the meantime, he had, in good faith, made large expenditures in permanent improvements, which add greatly to the present value of the land, and which the complainants will take if he is ejected. He insists that the complainants should not be allowed to recover possession until they have made reasonable compensation for such improvements. There can be no dispute that it is a well-established doctrine of equity that where a party lawfully in the possession of land, under a title which turns out to be defective, makes permanent improvements, in good faith, before he has notice that his title is defective, which materially increase the value of the inheritance, and the actual owner afterwards seeks relief against him in equity, relief will not be given except upon equitable terms. *2 Story's Eq. Jur.* § *1237.* But there are two reasons, I think, why this rule cannot be applied to this case. First, it is not yet determined which of these parties is entitled to the possession of the lands in dispute, and this court has no jurisdiction over that question. It is clear the defendant is, in no event, entitled to compensation from the complainants until their right to possession is established. This court cannot anticipate the judgment which may finally be pronounced in the action of ejectment, or make a provisional decree, which shall give or deny relief to the defendant, according as the suit at law may be decided against him or for him.

Second, the proofs, as I view them, fail to show satisfactorily, that the defendant's mistake (conceding now that he acted under

a mistake) was not the result of his own inexcusable negligence. The title to the lands in controversy, long prior to the defendant's purchase, had been the subject of both legislative and judicial investigation.   On the death of Ann Stanton's first husband, Barney Colgan, these lands escheated, and the right of the state was afterwards ceded to her by the name of Ann Colgan, by special act of the legislature, approved March 8th, 1836. *P. L. of 1836 p. 320.*   The title thus conferred upon her was afterwards disputed, by suit, by two of her husband's alien brothers. Their suit was tried in the Hudson circuit court, in December, 1853, and resulted in a verdict in their favor, but was subsequently decided against them by the supreme court.   *Colgan* v. *McKeon, 4 Zab. 566.*   The defendant, in procuring title, called to his aid a lawyer of experience and learning, who, I have no doubt, was perfectly familiar with the legal history of this title, and who, it is difficult to believe, did not impart to the defendant all that he knew concerning it.   The defendant, however, says he did not.   But he also says that he did nothing whatever to ascertain the extent or quantity of Stanton's estate.   He believed, he says, because Stanton was in possession, and he had never heard anything to the contrary, that Stanton owned the lands in fee, but he freely admits that he made no inquiry, nor search, nor investigation or exploration of any kind.   To a question requiring him to give the reasons why he believed Stanton had a fee, he made this extraordinary answer:  " I was not paying all the money down in a lump ; I was paying him gradually, and if I discovered, at any time before he got the full amount, that anything was wrong, I could stop."   His mistake, if any, in fact, existed—and I am free to say I think there is grave reason to doubt—was manifestly the result of the most reckless carelessness.   The observance of any degree of care, or the practice of the least caution, would have made it impossible for him to fall into any error.   Mistakes committed under such circumstances cannot be made the basis of relief in equity.   *Haggerty* v. *McCanna, 10 C. E. Gr. 48.*

The defendant also insists that he should not be required to surrender the two declarations of sale founded on assessments for

*Foley v. Kirk.*

the construction of a sewer, except on condition that the complainants first pay him such parts thereof as are properly chargeable against the estate in remainder.   A tenant for life must pay ordinary taxes.   That rule is not open to discussion.   But an assessment for the cost of a local improvement, which increases the value of the inheritance, stands on a different footing.   With respect to such impositions, the tenant for life has a right to ask for an apportionment.   According to the rule adopted in Massachusetts and New York, the tenant for life is required to contribute to the extent of interest during his life on the amount paid, and at his death the remainder-man must bear the charge of the principal, and thus they are made to share the burden in the same proportions in which they would share the benefits of an assessment for damages in their favor.   *Plympton* v. *Boston Dispensary, 106 Mass. 544; Stilwell* v. *Doughty, 2 Brad. 311.* But what right has the defendant to ask for an apportionment, or to be repaid any part of the sewer assessments ?   He did not pay them, nor has he shown any title or authority entitling him to stand in the rights of the person who did pay them.   According to the defendant's own evidence they were paid with Stanton's money, with money which he had agreed to pay Stanton for the land.   Stanton may have a right to ask for an apportionment, and to be re-imbursed, but the defendant certainly has no such right.

The complainants are entitled to a decree without conditions or terms, and that the defendants pay their costs.