204 N.J. Super. 345 (1985)
498 A.2d 1278
WILLIAM F. HYLAND, ATTORNEY GENERAL OF NEW JERSEY, ET ALS., PLAINTIFFS,
v.
ELWOOD KIRKMAN, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division Burlington County.
April 4, 1985.
*351 Robert Grabowski for plaintiffs (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
*352 Jerald D. Baranoff for defendant Elwood F. Kirkman (Sills, Beck, Cummis, Zuckerman, Radin & Tischman, attorneys).
Armen Shahinian for defendant Great Notch Development Corporation (Wolff & Samson, attorneys).
Charles L. Harp, Jr. for defendants Robert Kaufman, Mark DeMarco, Victoria Dreschler, Judith Kaplan, Saratoga Land Trust, K & D Land Trust and Cambridge Abstract and Research Corp., Inc. (Archer & Greiner, attorneys).
Stewart F. Kay for defendant Chelsea Title (Kay & Kay, attorneys).
Henry Gorelick for defendant David Fitzsimons (Gorelick & Groon, attorneys).
WELLS, J.S.C.
The general nature of this action, the allegations of the complaint, the demands for relief and disposition of certain issues are described in a published opinion of my late colleague, Judge Wood. Hyland v. Kirkman, 157 N.J. Super. 565 (Ch. Div. 1978). The reader is advised to consult that opinion before launching into this one, being mindful that this court does not find as fact all of the allegations described therein.
The trial of the case proceeded before Judge Wood on 14 trial days between May 23, 1983 and June 14, 1983. On June 29, 1983, closing arguments were heard and Judge Wood took the matter under advisement. Judge Wood died in 1984 before rendering a decision.
Upon transfer of the matter to me, R. 1:12-3(a), I tentatively decided that R. 1:12-3(b) applied and a new trial would not be required. An opportunity was afforded the parties to be heard, a request for a partial recall of witnesses was received and the matter argued. I determined I was able to familiarize myself with the proceedings and all of the testimony through a complete transcript, pleadings and exhibits, R. 1:12-3(b), and have *353 now done so. I am able to discharge my duty to dispose of the matter fairly without the recall of any witnesses. R. 1:12-3(c).
Plaintiffs' case rests on deeds and judgments of record in the Burlington County Clerk's office. In addition, there is no dispute that three corporations, Pinelands Development Corporation (PDC), West New Jersey Society (WNJ) and Tanners Brook, Inc. (TB) were owned and controlled by defendant Elwood Kirkman and the late Paul Burgess, Sr., whose estate is a named defendant. A further chronological history of the facts between 1961 and 1970 is, however, unnecessary. Rather the court chooses to state only the facts necessary to pose and determine the issues. A description, based on the record, of the principal parties and the lands involved known as the Isaiah Adams tract is, however, necessary.
Isaiah Adams was the returnee of a large tract of land surveyed by the Proprietors of West Jersey in 1859 situate in Bass River. His return encompassed 8,525.80 acres in a 23-course description which expressly excluded 26 surveyed exceptions returned to others leaving a net acreage of 4,662.89. Through subsequent conveyances the property became titled in Henry Shaw in August 1893. Shaw conveyed the westerly 2011 acres to Albert K. McMurray in February 1895, the south 1750 acres to George E. Godward in August 1895, the north 2000 acres to William Crawford Hawk and the east 2,797.7 acres to Meyer Beyer. Shaw's conveyances ignored the 26 exceptions, and although reasonably workable protractions of the descriptions give some idea as to where the parcels are in relation to one another and to the outbound description of the return to Isaiah Adams it is impossible to locate, with any accuracy, where the tracts are on the ground or the exact extent to which each is affected by one or more of the 26 exceptions.
After the basic four-part division of the lands by Shaw, his grantees and their successors failed to pay taxes and the resultant tax sales began to create liens. Furthermore while the record title to the McMurray, Godward and Hawk parcels *354 remained essentially stable subject to tax liens and the exceptions, Meyer Beyer's grantees multiplied like rabbits creating a title nightmare. Nonetheless it is with McMurray, Godward, Hawk and Beyer that the trial of title to the Isaiah Adams tract ends at the end of the 19th Century. McMurray, Godward and Hawk vanished without a trace and left no successors who have emerged even after the highly publicized start of this case. Beyer does, however, have living descendants as does one of the holders of an exception and their interests are discussed and determined herein. But it is not until 1960 that interest again focused on Isaiah Adams' lands.
The central figure in the case is Paul Burgess, Sr. Burgess went to work for Chelsea Title Company in 1922 and over the next forty years became one of the most renowned "title men" in South Jersey. Even though he was not a lawyer, few lawyers could match his knowledge and experience in the title field and several consulted him from time to time on title problems. By the early sixties, when the facts of this case began to unfold, Burgess had risen to President of Chelsea Title, and Chelsea itself had become one of the largest title insurers in South Jersey.
To Burgess, however, titles were more than a career. He, apparently, had a consuming interest in local history and archeology. He was a lifetime resident of Brigantine, served as its mayor and wrote a historical pamphlet about it. He particularly loved the Pine Barrens, the vast tract of wild and uncultivated woodland that stretches across the central part of Atlantic, Burlington and Ocean Counties encompassing Bass River and the Isaiah Adams tract.
Burgess was not a surveyor but with a surveyor's wheel, a fencing foil and a jeep, often accompanied by his daughter-in-law, Kathleen Keeney Burgess, he tracked for years through the Pine Barrens on weekends taking measurements, looking for monuments or other physical indicia of where properties described in deeds might be located. He sought out old cemeteries *355 for names and dates, old road beds and the foundations and remains of old buildings.
He spoke to people whom he, on rare occasion, found in the Barrens questioning them as to who owned the land. He often carried "Private Property" or "No Trespassing" signs with him and posted them. Many of the signs gave his phone number and name but no one ever called. Burgess also cut wood for his fireplace and holly trees at Christmas from these tractless barrens as did other Chelsea people.
Burgess died in 1975 after plaintiffs' investigation began but before he was questioned. Among the documents in evidence, however, are letters to and from him, memoranda and notes of his which give substantial insight into his ideas for acquiring title to what he conceived to be "abandoned" land in the Pine Barrens and particularly to the Isaiah Adams tract in Bass River. A great deal of this opinion is devoted to an analysis of Burgess' conduct in the matter.
Elwood Kirkman is a prominent attorney whose principal office is in Atlantic City. He is, and was throughout the sixties and seventies, the senior partner in a law firm which represented numerous business, banking and individual clients in that city, Atlantic County and South Jersey. Kirkman's knowledge and experience in title matters is beyond question. Much of his practice was devoted to real estate and real estate financing. He owned or controlled at least a third of the stock in Chelsea Title Company, and was its president for years before assuming the chairmanship of its board of directors, a position he held during all or most of the era in which the facts herein take place.
Kirkman and Burgess were friends and, of course, associated in business. It was to Kirkman that Burgess looked as a partner in the venture to acquire the Isaiah Adams tract. Kirkman authorized and controlled the deposit and expenditure of monies in and through WNJ and TB which he and Burgess owned and controlled.
*356 David Fitzsimmons, an attorney about five years out of law school in 1961, had been employed by Kirkman's firm ever since his admission to the bar. It was he who Kirkman assigned to work with Burgess on various real estate projects beginning in 1961 and thereafter, including the acquisition of the Adams tract. Because of his role as an implementor of Burgess' plan, Fitzsimmons is named as a defendant herein.
Robert Kaufman was an experienced real estate broker and developer primarily in New York City but with interests all over the country. In 1960, or thereabouts, Kaufman agreed to finance the attempt to acquire certain pinelands subject to seven tax sale certificates describing portions of the Isaiah Adams tract in which a Trenton attorney, Bernard Campbell, had an interest or could obtain an interest. Kaufman is not a lawyer, but was advised throughout either by Campbell, who died in 1965, or by New York counsel. In much of what he did, Kaufman proceeded in the name of an aunt of his, Judith Kaplan, as a straw-party. Kaufman knew none of the other parties prior to 1960 but eventually met all of them and, in fact, did in proceedings, not attacked herein, foreclose on a large part of the Isaiah Adams tract. His interest in other parts of the tract is, however, determined herein.
Defendant Mark DeMarco, an attorney, is named herein because of his dual role as solicitor of Bass River from 1961 through 1967 and as Kaufman's attorney from May 1966 to date. DeMarco also has an interest in a part of the Isaiah Adams tract which is affected by this decision.
Kathleen Keeney Burgess is Paul Burgess' daughter-in-law. At some point herein, Burgess interested Mrs. Burgess in searching and quickly discovered she worked with marked attention to detail. Although Burgess himself had done considerable search work in the Isaiah Adams title, he also put Mrs. Burgess to work on it and later, her experience being so great, Kaufman also engaged her for the same purpose.
*357 Mrs. Burgess used her maiden name (Keeney) and married name interchangeably. She is the Keeney in Keeney v. Dressel, infra at 358, a key proceeding in the matter. She also, like DeMarco, ended up with an interest in the Adams tract which is affected by this decision.

INTRODUCTION
On page 585 of Judge Wood's opinion, 157 N.J. Super., is an appendix displaying two chains of title out of Tuthill for parts of the Adams tract.[1] One chain, for 3,400 acres, that being the combined acreage into McMurray and Godward, supra at 353, ends in Great Notch (2,200 acres) and Kaufman (1,200 acres) who has since conveyed 100 acres to J & M.[2] The second chain for the remaining 1,400 acres ends in K & D Land Trust. The former chain will be referred to as the "sanitized" chain since the claim of its present holders is based on two court judgments. A major point of plaintiffs' case is to establish that these court proceedings were fraudulent. Plaintiff also asserts the latter chain, "unsanitized" by any proceedings, grants no title. There is, however, a pending action before this court involving this chain, Kaufman v. Adams, which is affected by this decision.

THE UNSANITIZED CHAIN
Both chains start with a deed from Richard Tuthill to PDC. The court finds that the deed from Tuthill to PDC in October 1961 was a "wild" or "thin air" deed, both apt descriptions. As used herein, the court defines a wild deed as meaning a written instrument, in the form of a deed, acknowledged and *358 recorded wherein the named grantor, knowing he, she or it has absolutely no title of any kind to the premises described therein nonetheless executes the instrument. Tuthill's deed clearly fits that definition in this case. He was a searcher at Chelsea and signed the deed at the request of his boss, the president of the company, Paul Burgess. He did not have, and never had, any interest whatsoever, choate or inchoate in the lands described in his deed and knew it. Burgess, as well, knew it. Tuthill was perfectly candid about that in his trial testimony.
Four years later on September 21, 1965 by deed signed "C. Trimble, President" PDC conveyed a part of the lands described in the Tuthill deed comprising about 1,400 acres to Victoria Dreschler, Mark DeMarco's sister-in-law, as trustee of Saratoga Land Trust, an entity created to hold in the interests of Kathleen Kenney Burgess, Dorothy Weisbecher and Lucy DeMarco in the land. Lucy DeMarco is Mark DeMarco's wife and his nominee. The conveyance represented a gift to Mrs. Burgess and Weisbecker apparently in consideration of the search work they had done for Burgess and Kirkman. Since Burgess knew that more work had to be done to secure good title he asked DeMarco to represent Mrs. Burgess and Weisbecker and agreed that DeMarco have a 30% interest as a contingent fee.
DeMarco's plan was to pay taxes on the 1,400 acres for five years and then file a quiet title action under N.J.S.A. 2A:62-2. But in May 1966 Kaufman engaged DeMarco to represent him in foreclosing Kaufman's tax sale certificates. Mrs. Burgess was engaged to do the necessary searches and by 1968 DeMarco realized that Kaufman's certificates might cover some part of the lands purportedly conveyed to Saratoga.
DeMarco immediately made a clean breast of the conflict to Kaufman. The problem was resolved by giving Kaufman a 50% interest in the lands described in deed to Saratoga. K & D Land Trust was formed naming Kaufman as trustee with Mrs. Burgess, Weisbecker, Mrs. DeMarco and Dreschler suffering a loss by half of their former interest in Saratoga. On November *359 28, 1968, Dreschler conveyed by lot and block description the Saratoga lands to K & D.
Mrs. Burgess' searches also revealed the Meyer Beyer title mess, supra at 353. Efforts were made to locate descendants of Beyer and ultimately a grandson of his, David Holzman, was found living and working in New York. In addition, descendants of the holder of one of the several exceptions out of the Beyer tract, Alfred E. Burdette, were also discovered. Kaufman, aided by DeMarco, sought to, and finally did acquire, in 1969 and 1970 respectively, deeds from the Beyer and Burdette heirs. The process by which the same was accomplished, however, is not, in the case of the Beyer heirs, gratifying.
The record taken as a whole discloses that Holzman and his attorney Hoffman, relied on a representation by DeMarco, acting under the guise of an apparently neutral abstract company, that K & D had an insurable title. Based largely on this representation and on practical considerations including the expense in searching and surveying the property and, perhaps, defending the title in court, Holzman decided to settle.
The Beyer heirs were not told that K & D had no title whatsoever, something DeMarco knew or ought to have known since its deed sprung directly from the Tuthill bargain and sale deed, less than eight years of record, which Burgess had procured. Rather, DeMarco writes to Kaufman on abstract company letterhead (P91) designed for use in Kaufman's negotiations with Holzman: "... this company will provide you title insurance as to the quality of your title but not as to the quantity." That statement is pure sophistry since no title company would insure either the quality or quantity of a title based on Tuthill's rootless eight-year-old bargain and sale deed. In fact DeMarco knew that Chelsea itself, Burgess' own company, would not provide title insurance on any part of the Adams tract because of the exceptions. A letter written by DeMarco to Kaufman's attorney in New York in 1966 is evidence of such knowledge. DeMarco, of course, knew that the K & D deed *360 came from PDC and thus had absolutely no basis for representing that K & D's title was insurable. For that reason regardless of all the other truths the letter may recite about the overlapping and conflicting descriptions out of Meyer Beyer, its potential to mislead depends entirely on a false premise: the quality and insurability of K & D's title, and its innate superiority over the Beyer claim. The Court finds P91 is palpably deceptive, Bron v. Weintraub, 42 N.J. 87, 91 (1964), that it was relied upon and made with that intent.
DeMarco and Kaufman also secured a deed from the Burdette heirs. In two letters DeMarco describes the title situation to one of them and their attorney. While the letters are written in a manner most favorable to K & D, taken as a whole, they do not contain the same glaringly false premise that infects P91 and are not, therefore, palpably deceptive.
Armed with K & D's deed, the deeds from the Meyer Beyer and Burdette heirs[3] and payment of taxes since 1965, DeMarco, on behalf of Kaufman, commenced a quiet title action under N.J.S.A. 2A:62-2, Kaufman v. Adams, C-2549-73, on March 29, 1974. That action is stayed pending decision herein although the Burdette exception has been settled. Since the purpose of the action is to quiet title in K & D it is an effort to "sanitize" the 1,400-acre chain of title arising out of the Tuthill deed. The efficacy of that effort must therefore be decided since a judgment would cut off Meyer Beyer and everyone who claims under him. But before reaching that issue the court will turn to the sanitized chain wherein the cleansing process is completed.

THE SANITIZED CHAIN
Examination of Judge Wood's chart, Hyland, supra, 157 N.J. Super. at 585, reveals another chain of title beginning with *361 the wild Tuthill to PDC deed and describing 3,400 acres. In 1962, about a year later, PDC executed a deed to WNJ which Burgess tells Fitzsimmons to prepare but not record. That is done on October 19, 1962 and two days later WNJ filed a quiet title action, WNJ v. Richards, C-414-62 under N.J.S.A. 2A:62-1. In my opinion the deed to WNJ and the quiet title action was hurried to gain advantage over Kaufman who was then pressing Bass River to deliver certain tax sale certificates to him. The contemporaneous exchange of letters, evidence that conclusion. Burgess supplied Fitzsimmons with the names of defendants[4] all of whom were served by publication. The complaint alleges WNJ to be in "peaceful possession under a claim of ownership." A supporting affidavit was filed, signed by Burgess, using identical language and on February 8, 1963 a default judgment of quiet title was executed by Judge Wick sitting in a chancery vicinage which included Burlington County. Ten days later PDC's deed to WNJ was recorded.
WNJ, now as owner of record under its deed from PDC and the quiet title judgment, defaulted on its 1963 and 1964 taxes. Fitzsimmons, acting for TB attended the resultant municipal sales and purchased the tax sale certificates for approximately $6,200. TB assigned the certificates in trust to Mrs. Burgess, who through Fitzsimmons filed, on December 22, 1966, a tax sale certificate foreclosure proceeding. Keeney v. Dressel, C-1939-66. In contrast to WNJ v. Richards, this proceeding was technically thorough. It named about 300 defendants who had any color of claim to the Adams tract, including the State. But see infra at 375. Service, for the most part, was by publication and on April 19, 1967 a final judgment by default *362 was entered. The proceedings were entirely regular on their face.
Pursuant to a September 1966 agreement between the Burgess/Kirkman group and Kaufman wherein Kaufman agreed to relinquish his interests under two of his tax sale certificates covering the 3,400 acres in exchange for 1,200 acres of the northerly portion of it after the tax sale foreclosure, Mrs. Burgess on May 12, 1967 conveyed 1,200 acres to Kaufman. Kaufman paid, also pursuant to the agreement, about one-third of the expenses of the action. He made no search of the title nor did he obtain title insurance.
On August 1, 1969 Mrs. Burgess, two-and-one-half years after final judgment in Keeney v. Dressel, supra at 361, conveyed the remaining 2,200 acres described in that action to the Society of the Divine Vocations (SDV) for a total consideration of $307,500, of which $229,500 was secured by a mortgage which she took back and immediately assigned to Burgess and Kirkman. On August 21, 1969 SDV conveyed the property to Great Notch Development Corp. for $403,740 which assumed and agreed to pay the SDV mortgage. Great Notch did obtain a Chelsea title report, showing title in SDV "by deed from Kathleen Keeney, Trustee, dated August 1, 1969 and recorded on August 7, 1969 in Book 1707 on page 592." Great Notch also thereafter obtained Chelsea's title policy.
There was no evidence of any relation between Burgess and Kirkman or any of their corporations and SDV or Great Notch or between Great Notch and SDV. Neither SDV nor Great Notch had any actual knowledge of the wild Tuthill deed or the manner in which TB acquired the tax sale certificates. The court further finds from the expert testimony that had Great Notch hired a title company unrelated to the parties herein it would have passed title on the basis of the judgment in Keeney v. Dressel.

*363 ANALYSIS: Wild Deeds

Plaintiff asks that the Tuthill deed be stricken of record as a "fraud" on the recordation system. Charging that it was prepared, signed and recorded for the purpose of creating a modern chain of title in order that the grantees thereof could claim "color of title" and eventually quiet title through court proceedings, plaintiff asserts that deeds, even if a nullity, should be stricken where they are used for a dishonest purpose. Foley v. Kirk, 33 N.J. Eq. 170 (Ch. 1880); Stevens v. Ryerson, 6 N.J. Eq. 477 (Ch. 1847).
Defendants, on the other hand contend that a wild deed, particularly one in form, as here, a bargain and sale deed, containing no warranties, is essentially harmless. They urge that a wild deed, unlike a deed purporting to be signed by one in the chain of title, but in fact, a forgery, would not ordinarily be discovered in a search of the record title or if it was, be quickly discounted as having no root. They further contend that a wild deed does have a legitimate purpose: to place on record a description of lands in the name of a known owner willing to pay real real estate taxes. They assert that the restoration of property listed in the name of "unknown owners" to the tax rolls is a worthy motive which, at the very least, rebuts any implication of fraud.
In so arguing, defendants urge the court's imprimatur on what was described as the "Burgess theory"[5] of wild deeds and what may, indeed, be a common practice in the use of wild deeds. Tuthill, himself, explained in no uncertain terms Burgess' idea:
Q. Do you recall on other occasions when you may have been asked by Mr. Burgess to sign a deed, whether you had a discussion with Mr. Burgess on the subject of the deed?
A. Yes ... It was explained to me that this was land that was lying for years on the tax rolls as accessments, [sic] unknown owner, nobody ever paying taxes ... Well, nobody paying taxes for a number of years. Perhaps a hundred *364 years. The land just being there and nobody every moving to the Township of Bass River, did not foreclose on it in rem, as the law provides for them. So, it was a case where a chain of title could be established by putting a deed on record. That deed would  that grantee, the buyer under that deed, would become accessed [sic] for the property, would start to pay taxes, would become a taxpayer, and over a period of time having paid hundreds, may be thousands of dollars in taxes, would have more interest than a party who a hundred years ago his great grandfather had a deed. This made sense. It was a case where the chain of title then becoming established would go before the courts and have their blessing. Everybody would  When the title was searched, everybody with an interest would be notified, served properly. They'd have their day in Court. If they wanted to come forth, they could do so.
In a significant additional clue to his thinking, a letter of October 22, 1958 to Fitzsimmons on entirely unrelated lands, Burgess wrote:
The 240 acre tract is made up of a number of small parcels, on which no taxes were being paid for many years and a large part of it was not assessed for taxes, our deed for this tract was given for the purpose of having it assessed in our name, but the deed itself conveys no title. [Emphasis supplied]
In an undated memo which the court finds from its content must have been written in response to a DeMarco letter of January 22, 1963 but after judgment was entered in WNJ v. Richards, supra at 361, Burgess admits:
We agree that Pinelands Dev. Co's title was defective.
When West Jersey Society acquired a deed they found the record title defective and instituted a proceeding to determine the ownership.
Evidently he believed that a wild deed gave the grantee "color of title" to property. A sheaf of notes found among his effects leads one to conclude that Burgess thought that such "color of title" was sufficient under N.J.S.A. 2A:62-1 and -2 to quiet title.
Both the letter and the notes point to the case of McGrath v. Norcross, 70 N.J. Eq. 364 (Ch. 1905) aff'd 71 N.J. Eq. 763, (E. & A. 1907) which contains language indicating that proceedings under those provisions were "not limited to actual owners of the disputed possession but extended to a person who claimed to own the land ... under a deed or other instrument." Id. at 368.
*365 Furthermore, to prove that a common practice in the use of wild deeds as a basis for quiet title actions exists defendants caused to be admitted, Title Comments, May 1959, authored by Maurice Silver, a prominent North Jersey title expert who, also relying on McGrath, said:
In discussions among title men it had been suggested that the plaintiff must actually own the property. But this, it seems to us is not the law. They apparently have no stomach for those who utilize the quiet title remedy for purposes other than those originally designed  to remove clouds, to determine disputes, to give a remedy where the common law possessory actions were inadequate. They recoil from the fact that the statute has been misused among some to acquire lands which appear lying about unclaimed.
While we are in accord with this moral position we believe it is not for the examiner to sit in judgment. The questions which must be determined are the basic ones of jurisdiction  jurisdiction over the subject matter, jurisdiction over the person, and a judgment in keeping with the pleadings.
Silver includes a quotation from McGrath and concludes:
When the court here speaks of a claim "[U]nder a deed or other instrument" it does so because the proceedings were brought under that section of the Act (now R.S. 2A:62-2) which permits the action where there is no actual possession by reason of the nature of the lands. The possession is presumed upon a showing of payment of taxes for a period of five consecutive years prior to commencement of the action and a claim under a deed or other instrument. Now R.S. 2A:62-1 makes no requirement of a claim under a deed, so that all that is apparently necessary is a claim of ownership.

The burden is thrust on the defendant to answer or he keeps silent at his peril. It is true that Chancery would, under proper circumstances give relief where a fraud was perpetrated, but not where the property finds its way into the hands of a bona fide purchaser. See Ostrum [Ostrom] v. Ferris, 99 N.J.E. 551, 134 A. 305, aff'd 103 N.J.E. 22, 141 A. 920. [Emphasis supplied]
But Burgess, at least, was capable of reading selectively. Among the notes is a page of definitions of "Color of Title," apparently taken from an edition of Black's Law Dictionary (the court has found almost identical definitions in the third edition) wherein several definitions appear including one which states: "an absolute nullity, as a void deed, judgment, etc., will not constitute color of title." The court asks, then, should a "wild deed" under any circumstances serve as a valid root of title?
The court's research on this question has led to an examination of the treatment of wild deeds in jurisdictions which have adopted a marketable title statute, a kind of legislative cleansing *366 mechanism. As New Jersey has not adopted such a statute the cases have been studied for analytic purposes rather than as precedent.
The effect of a marketable title statute is to extinguish stale or abandoned claims to title where another claimant has held title based on a record chain for a specific time period, typically, thirty or more years. The purpose is to permit reliance upon the record chain where it is completely linked for the statutory period and, thus to render harmless defects which may exist prior to its commencement. See Annotation, "Construction and effect of marketable record title statutes," 31 A.L.R. 4th 11 (1982).
Reasoning that the above stated purpose mandates the acceptance, as roots of title of all deeds that appear facially proper, definite, and of sufficient age, even if such deeds were potentially void or invalid, a number of courts have ruled that wild deeds could in fact serve as valid roots of title from which a chain of title could flow, so as to bar previous claims. See Miami v. St. Joe Paper Co., 364 So.2d 439 (Fla. 1978), app. dism. 411 U.S. 939, 99 S.Ct. 2153, 60 L.Ed.2d 1040; Mobbs v. City of Lehigh, 655 P.2d 547 (Okla. 1982).
However, a number of other courts have rejected the notion that titles defective due to a wild deed in the chain of title may be cured, reasoning that this would be tantamount to authorizing a complete stranger to title to defeat title in the true record owner. Thus, the court held in Exchange Nat. Bank v. Lawndale Nat. Bank, 41 Ill.2d 316, 243 N.E.2d 193 (1968), that a chain of title based on a wild deed could not serve as the basis for a root of title to bar a second claim emanating from an 1899 deed, although the claim involving the wild deed had been in the record chain of title for more than forty years. The court explained that the purpose of the statute was to simplify and facilitate land title transactions by allowing persons to rely on a record chain of title but did not contemplate two competing chains of title. If the rule were otherwise, a purchaser might *367 track title back to the sovereign and examine all grantor-grantee indicies but still not be sure that a chain of title based on a wild deed did not independently exist to prejudice his rights. The court was also concerned with the constitutionality of divesting a record title holder of title in favor of one claiming under a void instrument, but by construing the statute to preclude this result, did not reach the constitutional question.
Even in jurisdictions, such as Florida, where wild deeds have been accepted as valid roots of title, the instrument itself must purport to create or convey a specified estate. Thus in Wilson v. Kelley, 226 So.2d 123 (Fla.App. 1969) a quit claim "wild" deed was held not to have established a valid root of title. A quit claim deed, like the bargain and sale deed herein, purports to transfer whatever interest the grantor might have possessed in the land. The court was mindful that allowing such a deed to establish root of title would facilitate abuse of both the recordation system and the marketable title statute by complete strangers to title. Thus in Florida where the legislature has specifically mandated the extinguishment of old defects, some care has been taken to prevent abuse by complete strangers to title employing the device of wild deeds to pirate title.
As far as New Jersey is concerned with no marketable title statute in place, but a notice-race recordation system which has served well for years and upon which the public is entitled to and does rely this court must conclude that wild deeds, as defined herein, are an absolute anathema and their use should stop for any and all purposes at once. It goes without citation that they convey no title. But they are not, in fact, harmless: their mere recordation under our system is inherently deceptive and fraudulent, precisely because, defying their appearance, they convey no title nor any "color of title," but permit a stranger to the title to claim property without payment of taxes, adverse possession or with any semblance of due process.
*368 A recorded wild deed may cloud title in several ways: first, through the operation of N.J.S.A. 54:4-31, an abstract thereof will be sent to the municipal assessor who will then place the grantee on the tax rolls as the owner of the property. A municipal lien search, N.J.S.A. 54:5-11 et seq., will produce the name of that grantee as owner. The appearance of that name on the municipal records in the face of a record search of the true owner will raise a question as to title. Secondly, should the searches turn up the wild deed it could not but cloud an otherwise good chain of title. That is so because there are deeds which appear "wild" but are not. For instance, the deed of a married woman, the surviving heir of her father's intestate death may well appear rootless, as may the deed of a person who himself had acquired by an unrecorded deed. Since such possibilities exist a searcher cannot discount per se an apparently rootless deed without further inquiry. Doubts as to title would arise, causing delay, expense and possibly court proceedings.
In addition, of course, a wild deed may eventually be on record more than 60 years. A title based thereon will take on the appearance (and the fact) of insurability and validity awaiting the chance of exposure for the nullity it is, and the shaking of perhaps substantial interests dependant thereon.
Finally, wild deeds may, in the hands of the unscrupulous, be used to ground a wholly unjustified claim of color of title for the improper purpose of commencing court proceedings to quiet title against those record owners who the grantees thereof know, for one reason or another, will not appear to defend their title.
The court in Foley v. Kirk, supra, said:
To compel the surrender and cancellation of written instruments which have spent their force, and are mere nullities, but which, left in an uncancelled state, may becloud a title, or be used for dishonest purposes, is an ancient and well-established head of equity jurisprudence. [33 N.J. Eq. at 174].
*369 The court concurs. Accordingly, the Tuthill and PDC deeds are declared of no force and effect and are hereby stricken of record.

THE QUIET TITLE ACTION
The Burgess theory also invited the court to trek through New Jersey quiet title doctrine in the 19th Century and the journey shows that Silver was essentially correct  the remedy was designed only to remove clouds, disputes or doubts infecting an otherwise good chain of record ownership. It was not intended to permit a person to create title out of whole cloth or short cut the rigorous requirements of adverse possession to acquire title. P.L. 1870, CCLIII; Powell v. Mayo, 24 N.J. Eq. 178 (Ch. 1873); Bogert v. City of Elizabeth, 27 N.J. Eq. 568 (E. & A. 1876); Southmayd v. City of Elizabeth, 29 N.J. Eq. 203 (Ch. 1878); Nixon v. Walter, 41 N.J. Eq. 103 (Ch. 1886); Sheppard v. Nixon, 43 N.J. Eq. 627 (E. & A. 1887); Beale v. Blake, 45 N.J. Eq. 668 (Ch. 1889); P.L. 1891 at 323; Oberon Land Co. v. Dunn, 56 N.J. Eq. 749 (Ch. 1898); Blakeman v. Bourgeois, 59 N.J. Eq. 473 (Ch. 1900); P.L. 1901, c. 30; McGrath v. Norcross, 70 N.J. Eq. 364 (Ch. 1905)
McGrath itself involved proceedings under N.J.S.A. 2A:62-2 wherein plaintiff proved a chain of title to 1879 to 18,062 acres of land in Atlantic County and that the description included a 700-acre parcel which defendants denied her deeds covered. The court said:
... The act is intended to remedy a vexatious condition in which a person may find himself to be who honestly claims that his recorded title gives him the ownership of a large tract of wild, unimproved and unenclosed lands, which have been assessed to him for five years, and on which he has paid the taxes, in which property another person, who does not occupy the lands, yet insists that he has an interest which he does not disclose in support of his claim; who brings no suit to establish that claim, but himself physically enforces his alleged right by the cutting of timber and other acts of intrusion on the property.... The amending statute of 1901 is intended to raise a presumption of peaceable possession of such wild lands in favor of persons who have deeds for such property which have been recorded; who for five years have been recognized by the local taxing officers as owners thereof, and who have manifested the *370 good faith of their claim to ownership of those lands by the payment of the taxes. [70 N.J. Eq. at 370-71; emphasis supplied]
The court's requirement of honesty and good faith in claims of ownership elevates Silver's "moral position," supra at 365, to the only proper construction of the statutes. Neither McGrath nor any of its predecessors or progency came close to holding that the claim of ownership (N.J.S.A. 2A:62-1) or claim of ownership in fee under a deed (N.J.S.A. 2A:62-2) included a claim based on a wild deed procured by plaintiff himself. The court holds that both statutes must be construed as intending a bona fide claim of ownership based on 20 years adverse possession, Elmore Develop. Co. v. Binder, 97 N.J. Eq. 126 (Ch. 1924), or a deed wherein the grantor does have something to convey or honestly believes he does. Cf. B & HS Corp. v. Holly, 198 N.J. Super. 83 (App.Div. 1984).
The older cases make it clear that the allegations in a quiet title action of "peaceable possession under a claim of ownership" were the jurisdictional foundation of the equitable remedy. Beale v. Blake, supra; McGrath, supra; Toth v. Bigelow, 1 N.J. 399 (1949). If those allegations were not proved, the action was dismissed and defendant's title not put to trial.
Can the issue of whether WNJ met those jurisdictional requirements be questioned now over 20 years after judgment was entered? The court holds that it can. In the first place, R. 4:50-1(d) allows a reopener of a judgment where it is void so long as application is made "within a reasonable time." R. 4:50-2. Where common practice judges the validity of titles based upon a minimum search of 60 years, 20 years is clearly a reasonable time within which to challenge the basis on which an uncontested quiet title judgment was obtained.
Secondly, Judge Wood held that under R. 4:50-3 a court, in an independent proceeding, may set aside a judgment for fraud upon the court. Hyland, supra 157 N.J. Super. at 583-584. That decision is the law of this case.
*371 Finally under § 76 of the Restatement, Judgments 2d, we find:
Subject to the limitations stated in § 74, a person who is not bound by a judgment under the rules of res judicata may obtain a determination that the judgment is ineffective as to him through an action to restrain enforcement of the judgment, for a declaration that the judgment is ineffective as to him, or similar relief, when:
(1) The existence of the judgment jeopardizes a protectible interest of his; and
(2) The character of his interest warrants his being given relief forthwith rather than on a future occasion.
Although Judge Wood couched his remarks on this issue in the language of "standing," Hyland, supra at 574-577, and appropriately so, the court is satisfied that his holding also brings this action squarely within conditions (1) and (2) of § 76.
Section 74 of the Restatement, nonetheless, would deny relief if plaintiff has not been reasonably diligent in discovering the ground for relief or the relief is time barred. Plaintiff's investigation herein commenced in 1974 and this action was filed on October 5, 1977, over 14 years after the entry of judgment in WNJ v. Richards. Once more, however, 14 years in the life of a land title is hardly the blink of an eye and no relief sought herein is by statute or case time barred. We find no evidence that plaintiff has been dilatory or that it failed to act promptly when the facts were discovered.
Section 74 supra, however, would also deny relief where such would "inequitably disturb an interest of reliance on the judgment." Restatement, Judgments 2d, supra, § 74(3). The comment states:
... A judgment determining interests in property .. . is usually a base of reference for specific future plans and acts by the parties. In proportion as the plans and acts in reliance on the judgment are substantial in moment and prolonged in duration, they become considerations that ought to give stability to the judgment. Hence it is that relief should be denied, or granted only in part, when the effect of granting relief would be unjustly to disturb that stability.
The issue is of concern to the court since there is no question that the title industry relies on judgments of quiet title and tax sale foreclosure certificates in which the docketed proceedings *372 are regular on their face. The courts are admonished not to destabilize titles to real estate. Palamarg Realty Co. v. Rehac, 80 N.J. 446, 460-461 (1979). The court does not wish to cast doubt, generally, on titles which rest in whole or part on quiet title or tax sale foreclosure judgments. Nor does it believe it does so on the peculiar facts of this case wherein it is clear the judgments were procured by one who knew the root of title was a wild deed. If the court, as it will, imposes the burden of its judgment on those guilty of an abuse of the courts, then equity will have been served and the broader implications for titles will be limited. For the above reasons the court will determine the jurisdictional basis supporting the judgments entered in WNJ v. Richards.
The court first holds that a bona fide "claim of ownership" in a quiet title action under N.J.S.A. 2A:62-1 or -2 may not be founded on a wild deed sworn by plaintiff himself. McGrath, supra; cf. Saxton v. Hunt, 20 N.J.L. 487 (Sup.Ct. 1845); Foulke v. Bond, 41 N.J.L. 527, 542 (E. & A. 1879). Knowledge that their deeds were wild must, of course, be imputed to both PDC and WNJ through the knowledge of their legal and beneficial part owner, Burgess.
The court further finds that WNJ did not have statutory peaceable possession to vest jurisdiction in the court to quiet title, despite Burgess' sworn affidavit to the contrary. It is true that WNJ, if it had had title, might have "tacked" all of the Burgess' alleged possessory acts prior to its deed and perhaps even prior to the Tuthill deed. Accordingly, it is not significant on the claim of possession that WNJ could have had possession, if at all, for only two or three days under its deed from PDC. Oberon Land Co. v. Dunn, 56 N.J. Eq. 749 (Ch. 1898). Those possessary acts have been previously described, supra at 353, but are simply not sufficient to reduce a 3,400-acre tract to "possession." Blakeman v. Bourgeois, supra sets the standard for statutory quiet title possession:

*373 What constitutes such a possession of lands must be indicated by the acts of the party claiming to own them. These acts will naturally adapt themselves to the nature of the lands and the uses which may be made of them. In this case the property was incapable of being farmed. It was almost, if not quite, an island on which grew salt grass and sedge, valuable for hay or litter. Part of it was usable as oyster grounds, or which oysters might be planted for future use. Ducks and other game made it attractive for gunning, and its nearness to the thoroughfare, for fishing, so that it was rentable to city people for a clubhouse, for those uses. There was no other purpose for which this property could be used. If a person went there to look at it, to see whether any one was claiming ownership in it, he would naturally examine it with relation to those incidents for which it might be used by the claimant. The law implies notice to parties interested in such cases in much the same way, the acts of possession varying according to the nature of the land. [59 N.J. Eq. at 476]
See also Oberon Land Co. v. Dunn, supra and Powell v. Mayo, 24 N.J. Eq. 178 (Ch. 1873); McGrath v. Norcross, supra.
In this case, Burgess' acts of historical or archeological exploration or making measurements in aid of title searching and protracting deed descriptions do not meet the standard of the statute, a standard which while falling far short of that needed for title by adverse possession, is clearly greater than casual trespass. McGrath, supra. Nor do his acts in cutting wood, ibid., or posting the property amount to effective dominion over the property. The no trespassing and private property signs which a coterie of hunters who testified did not see, "were wholly unrelated to any defined territory," ibid., and could not reasonably be perceived as an exercise of actual possession over the entire 3,400 acres. Indeed, posting signs is hardly more than constructive possession.
What is more, Burgess was aware of the requirements for possession. Amongst the same sheaf of notes referred to previously, is a letter from an attorney, Richard Mischlick to Burgess dated 1944 giving a list of eight cases on quiet title. Among the cases cited is Oberon v. Dunn, 56 N.J. Eq. 749 (Ch. 1898), highlighted by someone with a note "sufficiency of possession." A reading of that case at 753-755 reveals extensive acts of possession by plaintiff therein or his predecessor. Burgess could not have read Oberon or McGrath without recognizing the vital role actual "possession" in the sense of *374 "effective dominion" played in quiet title actions. Accordingly, his sworn statement to the court was, at worst, a deliberate lie or, at best, in reckless disregard of the truth.
One useful definition of the idea of fraud on the court is found in Pfizer, Inc. v. International Rectifier Corp., 538 F.2d 180 (8th Cir.1976), cert. den. 429 U.S. 1040, 97 S.Ct. 738 (1977):
Fraud on the court, though not easily defined, can be characterized as a scheme to interfere with the judicial machinery performing the task of impartial adjudication, as by preventing the opposing party from fairly presenting his case or defense. A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel, and must be supported by clear, unequivocal and convincing evidence. [at 195].
In this case, the court finds by the clear and convincing weight of the evidence that the knowing use of a wild deed to claim ownership and the false assertion of possession in a quiet title proceeding cognizant that in all probability, based upon service by publication, no one would appear to question the allegations, constitutes "egregious misconduct directed at the court itself." For the reasons stated judgment entered in WNJ v. Richards is declared a nullity and of no more force or effect in vesting title in WNJ than was the deed from PDC.

THE TAX SALE FORECLOSURE
This brings the court to the tax sale foreclosure, Keeney v. Dressel, supra at 361-362. The court finds that Burgess either knew or had reason to know that the judgment in WNJ v. Richards was worthless to quiet title in WNJ. Otherwise he would not have risked further proceedings; and yet in 1963 and 1964 WNJ deliberately let its taxes go unpaid in order to set up a tax sale foreclosure. In a memo reciting the history of WNJ's relation to a 3,711-acre tract in Bass River, written in 1966, Burgess wrote: "We have let the taxes go to tax sale and three liens are not held by Tanners Brook, Inc., two of which may now be foreclosed." Does a judgment of tax sale certificate foreclosure so procured, but entirely regular on *375 its face, perfect title? The court holds it does not. N.J.S.A. 54:5-52 provides:
The certificate of sale shall be presumptive evidence in all courts in all proceedings by and against the purchaser, his representatives, heirs, and assigns, of the truth of the statements therein, of the title of the purchaser to the land therein described, and the regularity and validity of all proceedings had in reference to the sale. After two years from the record of the certificate of sale, no evidence shall be admitted in any court to rebut the presumption, unless the holder thereof shall have procured it by fraud, or had previous knowledge that it was fraudulently made or procured. [Emphasis supplied]
N.J.S.A. 54:5-97 provides:
The Superior Court, in an action to foreclose the right of redemption, may give full and complete relief under this chapter ... to adjudge an absolute and indefeasible estate of inheritance in fee simple, to be vested in the purchaser. The judgment shall be final ... and no application shall be entertained to reopen the judgment after 3 months from the date thereof, and then only upon the grounds of lack of jurisdiction or fraud in the conduct of the suit. [emphasis supplied]
See also N.J.S.A. 54:5-82.
Read together these provisions unmistakeably allow a collateral attack on a tax sale proceeding for fraud. True, where a defendant answers in the proceedings he must raise the issue or a conclusive presumption of the validity of the tax and the tax sale itself is raised after five years from the judgment of foreclosure, N.J.S.A. 54:5-100; but, that provision does not preclude a later collateral attack in the case of a default judgment. The court notes that while the State was joined and served by notice in Keeney v. Dressel, the notice recited only its possible claim to inheritance taxes. The notice did not mention the State's title in one of the exceptions.[6] For these reasons the court will examine the manner in which TB secured the certificates which eventually Keeney foreclosed.
The court finds it fraudulent for a corporation which has procured a wrongful assessment in its name through a wild deed and a quiet title judgment by fraud on the court to default on its taxes permitting a related corporation to buy the tax sale *376 certificates which it then forecloses. Foley v. Kirk, 33 N.J. Eq. 170, 175-178 (Ch. 1880); Roll v. Everett, 73 N.J. Eq. 697 (E. & A. 1908); Palamarg Realty v. Rehac, 80 N.J. 446, 454 (1979).
In effect, where a corporation related by a common ownership to a second corporation buys at a tax sale conducted upon the default in taxes of the second corporation, nothing has happened but that the second corporation has done its duty to pay its taxes. Foley v. Kirk, supra. Form will not be exalted over substance. A party should not benefit, in equity, from its own wrongdoing: that is, to acquire a tax sale certificate and its attendant right to foreclose and cut off all interests in the premises when it would have had no right upon the timely payment of taxes.
Where the statutory process is used to strengthen title, fraudulently obtained, and/or cover up such fraud the public sale is a sham. Had Tanners Brook by chance been outbid at the tax sale, WNJ would have, as owner of record under the quiet title judgment, redeemed. N.J.S.A. 54:5-54. True a sophisticated bidder, successful at the sale might well have investigated and challenged WNJ's right to redeem. But the court finds that such a limited restraint on the potential for abuse of public tax sales is insufficient to stop the abuse. The conduct displayed herein by WNJ and Tanner's Brook is inconsistent with the policy of protecting a defaulting taxpayer's interest in the property until the very last. Cf. N.J.S.A. 54:5-25, -26, -27, -86, -97.1, -98 and R. 4:5-4. It sacrifices the primary purpose of the system, ensuring the regular payment of taxes by those who own property to its collateral purpose, granting a cleansed title to those who buy at tax sales. For the reasons stated the judgment in Keeney v. Dressel, is declared a nullity.
Do these successive rulings striking the Tuthill and PDC deeds and voiding the judgments in WNJ v. Richards and Keeney v. Dressel affect the title of Great Notch, Kaufman and *377 Kaufman's grantees? What do they imply for the pending quiet title action in the unsanitized chain, Kaufman v. Adams?

DISPOSITIONS
The court is satisfied that notwithstanding the striking of every single basis of title from under Great Notch it is a bona fide purchaser for value without notice and its title from SDV cannot be disturbed. Palamarg Realty Co. v. Rehac, 80 N.J. 446, 459 (1979); Ostrom v. Ferris, 99 N.J. Eq. 551, 557 (Ch. 1926); Schultz v. Sanders, 38 N.J. Eq. 154 (Ch. 1884); B & HS Corp v. Holly, 198 N.J. Super. 83 (App.Div. 1984). Great Notch had no actual or constructive knowledge of fraud. The experts who testified at trial established beyond doubt that a reasonably diligent record search of the title, including an examination of the regularity of the proceedings in Keeney v. Dressel, would not have revealed the facts exposed by the trial in this case and therefore Great Notch is entitled to rely on the record. That holding comports with the policy of not disturbing titles. Restatement, Judgments 2d, § 74.
The issue of whether Robert Kaufman, who obtained 1,200 acres as the result of his settlement with Burgess and Kirkman is a bona fide purchaser for value is more complex. After a review of all the evidence, the court concludes he is and cannot be estopped from so claiming. The reasoning is as follows:
Kaufman's original entry into this matter is briefly described in Judge Wood's opinion, Hyland, supra, 157 N.J. Super. at 572, and at 356 supra. Essentially, in 1961, Kaufman purchased seven privately held, unrecorded tax sale certificates sold in 1928 two of which (totalling 2,000 acres) covered lands assessed to Godward and McMurray described in the wild Tuthill deed. The certificates were recorded in 1961 and through two court proceedings, not fraudulent in any way, one settled and one sucessfully litigated, Kaufman had, by June 1964, secured a ruling he had an interest in certificates describing *378 the same property sold to Bass River in the year 1936. N.J.S.A. 54:5-54; Van Roden v. Manso, 115 N.J. Eq. 69 (Ch. 1934). Since the 1936 certificates were exempt from the requirement that they be foreclosed in 20 years, N.J.S.A. 54:5-79, Kaufman was positioned to foreclose them. N.J.S.A. 54:5-85 et seq.
But as we have seen WNJ had obtained its judgment in WNJ v. Richards, supra at 361-362. WNJ had also started a suit against Bass River claiming it had a right to redeem the Kaufman certificates. This claim and the case between Kaufman and Bass River (although decided and on appeal) were interpleded. Through Fitzsimmons this conflict was nearly resolved when Campbell died. Final settlement awaited until February 1966 when the Burgess-Kirkman group and Kaufman met to discuss their respective claims to the 3,400-acre Godward and McMurray tracts. Out of that meeting came an agreement in which Kaufman relinquished his rights in his 1936 certificates describing the McMurray-Godward lands in exchange for an agreement to convey to him 1,200 acres of the property after the tax sale foreclosure proceedings. Supra at 361.
Contrary, however, to plaintiff's assertions, the court cannot find anything wrongful in Kaufman's actions or anything that would put him on notice of the defects, now exposed, of WNJ's title. Clearly, the Burgess-Kirkman group would not have revealed to Kaufman the truth about PDC's deed, the relationship between PDC, WNJ or the basis on which WNJ procured its quiet title judgment. Indeed, both parties huffed and puffed over the quality of their respective positions. Had Kaufman searched he would have found the quiet title judgment and could have reasonably relied thereon. Palamarg, supra. Kaufman, although he, of course, was on notice of the Godward-McMurray ownership from his own certificates, BH & S v. Holly, 198 N.J. Super. 83 (App.Div. 1984), could have reasonably believed that the WNJ quiet title judgment, which named Godward and McMurray, had cut off their interest. The relinquishment of his right to foreclose the 1936 certificates to *379 Burgess and Kirkman and his payment of one third the costs of the proposed foreclosure was clearly "value" exchanged for the 1,200 acres. Finally, since his certificates had not been improperly or fraudulently obtained he cannot be estopped from claiming bona fide purchaser status.
For the reasons stated, Kaufman's title under the deed from Keeney cannot be disturbed. Palamarg, supra. It follows Kaufman's grantees, Huron and J & M, are also protected. There is no allegation that they knew of or participated in any of the Burgess machinations.
The court's holdings affect the jurisdictional underpinning of Kaufman v. Adams (except for the settlement with Burdette) since the K & D deed from Saratoga and the Meyer Beyer deeds might not qualify as bona fide "claims of ownership," supra at 370, the one having root only in the Tuthill deed and the other having been procurred by the palpably deceptive content of P91. Supra at 359-360. The Meyer Beyer heirs have answered in Kaufman v. Adams. If they move to strike those deeds and dismiss that action as to their interest (excepting the Burdette settlement) such will be the probable result, absent facts or equities not presently before this court which matters may be raised in opposition to any such motions. The Meyer Beyer heirs may assert an affirmative claim to record title of the 1,400-acre tract if they deem they can prove it. The court reserves the right to consider reimbursement of back taxes paid by Kaufman and refund of the $5,000 paid by Kaufman.
What about Kaufman's former interest in the 1,400 acre tract? It will be recalled that Kaufman's five remaining certificates may have covered what was claimed by Saratoga. Supra at 358. Kaufman has since foreclosed four of those certificates. Whether Kaufman could have foreclosed on the Saratoga lands is not entirely clear on the record. DeMarco apparently thought so. Kaufman may, therefore, seek to reopen his tax sale foreclosure certificate judgment to include the lands covered in the Saratoga deed into K & D. Or Kaufman may wish, if *380 his unforeclosed certificate covers those lands, to commence another foreclosure action. In either case his right to foreclose may be subject to Meyer Beyer heirs' right to redeem.
The central role of the partners Burgess and Kirkman has been described. While there are some high blown assertions that these defendants were working in the public interest to restore lands to the tax rolls, the facts are that the payment of taxes was small relative to the $307,500 gained from the sale of the Adams tract to SDV, supra at 361, and the taxes stopped when it suited the ends of the scheme. No one appointed Burgess or Kirkman to collect taxes for Bass River. They were officious intermedlers bent on using the court and recordation system in ways not intended to create title in themselves for profit. That they were among the most knowledgeable persons in South Jersey to deal in real estate matters adds to the seriousness of the abuse and the manipulation of the recordation system they lived by. As the president and chairman of the board of a major title insurer they should have been at the forefront of putting to an end whatever common practice dictated the use of worthless, and deceptive wild deeds. Instead they joined the crowd with the result that many titles may be implicitly shaken by this decision  a result clearly predictable given basic conveyancing principals; the unmistakeable teaching of quiet title history, supra at 369-370 and the policy behind tax sale foreclosures, supra at 374-377.
Even though Kirkman's direct participation was peripheral his legal and ethical responsibility is more than vicarious. He provided the money which went into PDC, WNJ and TB and he and Burgess controlled the disbursement of it. He and Burgess took an assignment of the SDV purchase money mortgage from Mrs. Burgess; and Kirkman, personally, attended the February 1966 meeting with Kaufman which resulted in a division of the spoils. Finally, it is he, who ultimately should, and does, bear the responsibility for failing to examine and supervise Burgess' activities and to review Fitzsimmon's pleadings. There is little enough excuse for them  there is no excuse for Kirkman. *381 Finally Kirkman's failure to recognize the essential worthlessness and deceptive quality of wild deeds, his acquiescense in the wrongful manipulation of the courts all in the furtherance of private and personal ends exposed Chelsea itself to liability on its coverage to SDV and Great Notch.
For the stated reasons and even though Great Notch and Kaufman have not been divested of title Kirkman and Burgess were unjustly enriched. Factors however, beyond this court's control which have intervened suggest some caution in the use of the court's power to redress that wrong. In the first place, 16 years have past since the sale to SDV. Secondly, Burgess, who lived six years past that sale, has now been dead nearly ten years.
It is therefore inequitable to visit the imposition of any remedial judgment ordering disgorgement of the sale proceeds as against Burgess' heirs or devisees. Even if the court assumes Mrs. Burgess was among his beneficiaries, recoupment of her inheritance, if any, at this late date is harsh given the level of her participation in the matter. She, like Fitzsimmons was unmercifully manipulated by Burgess in a scheme which she could not have fully appreciated. Accordingly no relief will be granted against Burgess' estate or Mrs. Burgess.
Kirkman, however, is before the court. Presumptively he and Burgess shared equally in their venture. To that same extent, then, Kirkman is directed to disgorge his share of the sale proceeds to SDV, which the court finds in the sum of $164,097.75 which includes the interest on the SDV mortgage fully paid on August 14, 1974 together with prejudgment interest at the rate of 6% from August 15, 1974 to August 15, 1976, 8% to August 15, 1978 and 9% thereafter. The parties may within 30 days hereof request a hearing for the introduction of evidence rebutting the aforesaid presumptive equal share. Failing such request judgment will be entered accordingly. The amount so adjudged shall be paid within 90 days of judgment and deposited in the Superior Court Clerk's office under and pursuant to the terms of a constructive trust hereinafter *382 described to be disbursed under the usual practice upon my order.
A constructive trust is a familiar remedial device of equity jurisprudence to redress unjust enrichment. D'Ippolito v. Castoro, 51 N.J. 584 (1968). Bron v. Weintraub, 42 N.J. 87 (1964). It is an eminently flexible device which will be administered as follows:
(1) Among the purposes for which the fund may be used are:
(a) payment to the heirs, assigns, devisees, or grantees of Albert McMurray and George Godward, as their interest in the land may appear upon such proofs and upon such other reasonable terms and conditions as the court may direct;
(b) payment of reasonable costs and counsel fees of the parties hereto including plaintiff under the usual rules and equitable principles implicated in such payments from a fund in court.
(c) payment to claimants of any part of the Isaiah Adams tract as their interest may appear, including the State, upon such proofs and terms and conditions as the court may direct;
(2) Applications for disbursement of the funds shall be made only by notice of motion to all parties accompanied by an affidavit and brief.
(3) The court reserves the right to appoint a special master to hear all issues under paragraph 1.
(4) The parties may suggest other criteria for payment out of the trust. Such may be done only by notice of motion to all parties.
(5) Plaintiff may move to terminate the trust by escheat upon compliance with applicable law.
The case with respect to Fitzsimmons is difficult to analyze and has both legal and ethical aspects. Though young and inexperienced, Fitzsimmons, as an officer of the court, had a duty to inquire into the factual and jurisdictional foundations of both the quiet title action and the tax sale foreclosure. He did sign all the pleadings in those cases but the record before this court is not clear that he knew they were false or questionable with respect to jurisdiction. There was no clear duty or rule in either quiet title proceedings or tax lien foreclosures to allege the basis of plaintiff's claim of ownership or of possession or how plaintiff acquired the certificates. None of the standard form books illustrate such allegations.
On the other hand his personal participation on behalf of Tanners Brook in purchasing the tax sale certificates of *383 WNJ, corporations he knew to be related poses a difficult question of proper attorney behavior which I will leave to another forum to decide. Fitzsimmons worked entirely under the thumb of Kirkman and Burgess. He believed, with some justification, that common practice contemplated this mode of acquisition of title to property off the tax rolls where the record owners had not been seen or heard of for years. In any event it does not appear that he was in any effective position to challenge the superior experience and background of either Burgess or Kirkman let alone prevent their course of conduct. Finally, other than the continuation of his regular salary and perhaps modest bonuses, Fitzsimmons did not profit from the sale to SDV. For these reasons the court grants no relief to plaintiff as against Fitzsimmons.
Plaintiff also complains of Mark DeMarco. The court has commented about DeMarco's role in obtaining deeds from the Meyer Beyer heirs. Supra at 359. The deed may be stricken and with them may fall Kaufman v. Adams. See Supra at 379-380. DeMarco may thereby lose any claim to his fee out of the 1,400 acres. On the other hand, the Beyer heirs have had $5,000 from Kaufman for lands they may have had no interest in whatsoever. As a result they are either (1) not damaged by what DeMarco did or (2) may be able to cure any possible damage if they choose. Supra at 379-380. DeMarco also played a role in the 3,400-acre chain. Plaintiff seeks to place a sinister color on that role. Hyland, supra 157 N.J. Super. at 572; DeMarco was solicitor of Bass River during the period 1960 to 1967. He owed the governing body the utmost duty of fidelity and loyalty and should have avoided even the appearance of a conflict. In so far as the court is able to discern from this record he represented Bass River ably even though he tended to favor Burgess' claim to the 3,400 acres over Kaufman's. He did accept from Burgess a contingent fee in September 1965 consisting of an interest in the 1,400-acre chain, the title to which was highly questionable but which was not directly involved in the Burgess and Kirkman fight with *384 Kaufman. However, the court does not find that he did so in consideration for attempting to fight off Kaufman for Burgess as to the 3,400-acre chain or for sacrificing the interests of Bass River. The Burgess-Kirkman and Kaufman squabble was not really over until after the February 1966 meeting and not signed, sealed and delivered until September 1966. In the middle of that period, DeMarco agreed to represent Kaufman primarily to foreclose his certificates (won in the law suits with WNJ and Bass River) but also assisted him in finalizing the settlement with Kirkman and Burgess.
Whether his past or continuing solicitorship of Bass River ethically precluded such representation, the court leaves to the appropriate forum but it does not amount to fraud justifying any relief to plaintiff.
Toward the end of 1969 (two years after the end of his Bass River solicitorship) DeMarco in order not to reveal his representation of Kaufman did ghost write a letter for Kaufman's New York attorney to sign and send to Bass River's tax collector resisting the latter's proposed removal of K & D as an assessed owner of certain lands covered in K & D's deed. Once again an ethical question is presented emerging out of the dual representation of Bass River and Kaufman which this court leaves to another forum.
The court must also deal with the question of Chelsea's role in this matter and what the court refers to as the "B & HS defense."
Plaintiff seeks to make Chelsea a participant in the actions of Burgess and Kirkman. Other than Tuthill, who acted outside of his regular duties at Chelsea in signing his famous deed at the special request of Burgess, no employee of Chelsea participated in the events of the case until the sale to SDV. Two employees, Wilbur Barrett, whose resignation from Chelsea had been announced but was not yet effective, and Kenneth Scull, reviewed an extensive search of the McMurray and Godward tracts at Burgess' request and passed title thereon based on the record judgment in Keeney v. Dressel. But *385 there was no evidence that they knew about the matters found herein. Chelsea made no application to be relieved of its coverage obligations and did not crossclaim against Burgess or Kirkman for indemnification of its own or Great Notch's defense costs. To the extent not barred by applicable law, Chelsea shall continue liable under its policy to Great Notch for those claims it assumed the risk for when Great Notch took title. Otherwise the evidence supports the conclusion that Burgess and Kirkman were acting throughout on their own account and not as agents of Chelsea. Accordingly, their actions are not vicariously imputable to Chelsea and plaintiff may not obtain relief against it.
The "B & HS defense," so called because of the case from which it derives, B & HS Corp v. Holly, 198 N.J. Super. 83 (App.Div. 1984) asserts, based on the record in that case, admitted in this one, that the State agreed to acquire lands not at issue here from B & HS Corporation knowing that its claim was based on a highly suspicious deed and ultimately agreed to participate in a quiet title action to cure defects arising therefrom. The defense, then, is a claim of estoppel by unclean hands: plaintiff should not be heard to complain about Burgess' actions herein when it appears it may take advantage of like actions by John Dougherty in B & HS Corp.
The argument has surface appeal. Clearly, as a policy matter the State should not participate in the black market in suspicious titles. Questions concerning title to land the State wishes to acquire may be resolved in condemnation actions. Knowledge of competing and apparently sound chains of title may impugn the State's status as a bona fide purchaser without notice. Ibid. It may prevent the State, as private parties, from making a bona fide claim of ownership in a quiet title action where the root of title is a suspicious deed.
But that is not to say that plaintiffs, in equity, should be precluded herein. Cf. In re Allstate Ins. Co., 179 N.J. Super. 581, 593 (App.Div. 1981) The State may well suffer the consequences of its knowledge in B & HS  that is still to be decided, *386 but this court will not now in the exercise of its discretion estop plaintiff, in a matter so deeply affecting the public interest, from proceeding.
Finally, the court's review of the pleadings indicates a multiplicity of counterclaims and crossclaims some of which may not be entirely resolved by this opinion. Within 30 days hereof, plaintiff will notice, by mailing a copy of this opinion to every party, pro se, and every counsel who filed an answer but who did not appear at trial and who has a pending counterclaim or crossclaim of the filing of this opinion. Within 30 days after such notification any party desirous of adjudication of any counterclaim or crossclaim shall file a notice of motion without return date with the court specifying in detail what relief that party seeks, against whom and attach thereto (a) a copy of the filed counterclaim or crossclaim, (b) an affidavit of proof and (c) a brief. Upon close of the 30-day period the court will fix a return day when such motions will be argued. If factual issues exist a plenary hearing shall be set promptly. Unless rights under cross and or counterclaims are so preserved they shall be deemed dismissed with prejudice.
Mr. Grabowski shall submit an order conformable herewith.
NOTES
[1] The appendix refers to 4,800 acres. There is no doubt that it is intended to be the residue of the Isaiah Adams tract of 4,662.89 acres, see text, supra p. 353. Since much of the transcript deals with round figures this court shall as well.
[2] It is undisputed that Kaufman also conveyed 125 acres to Huron Realty Co. and thus now holds 975 acres.
[3] DeMarco also acquired for K & D, prior to his filing Kaufman v. Adams, a tract of 72 acres from Margaret LeMunyon. This deed does not affect the Isaiah Adams tract and is not attacked in these proceedings.
[4] The defendants named are few in number and are, in addition to McMurray & Godward, holders of exceptions out of the McMurray and Godward tracts. Plaintiff's expert criticized the proceedings for failure to name others who had an interest in the lands. The lead defendant, Richards, was a grantee from the West Jersey Proprietors whose chain of title thereafter passed to the State. The State was not named as a defendant.
[5] No one asserts Burgess invented the use of wild deeds portrayed herein.
[6] See n. 4 supra at 361.