**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4052-15T1
     A-4266-15T1

RANDY GOLDBERG, an
Individual and Member of
MYNJSOLAR, LLC,

  Plaintiff-Appellant/
  Cross-Respondent,

v.

ROBERT STOLKER, an
Individual and Member of
MYNJSOLAR, LLC and JARED
KABAN, an Individual,

  Defendants-Respondents/
  Cross-Appellants.

_____

    Argued October 23, 2018 – Decided January 3, 2019

    Before Judges Fisher, Hoffman and Firko.

    On appeal from Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. C-000117-10.

    Michael J. Confusione argued the cause for appellant/cross-respondent Goldberg in A-4052-15 and

respondent Goldberg in A-4266-15 (Hegge & Confusione, LLC, attorneys; Michael J. Confusione, of counsel and on the brief).

Sam L. Maybruch argued the cause for respondents/cross-appellants Stolker and Kaban in A-4052-15 and for appellant Stolker in A-4266-15 (Arbus, Maybruch & Goode, LLC, attorneys; Sam L. Maybruch and Matthew R. Goode, on the brief).

PER CURIAM

It is commonly said that litigants aren't entitled to perfect trials, only trials free of prejudicial error. Maleki v. Atlantic Gastroenterology Assocs., P.A., 407 N.J. Super. 123, 128 (App. Div. 2009). The trial here was far from perfect. But for the fact that one issue got lost in the shuffle, we are satisfied the parties had a full and fair opportunity to prosecute or defend against all the claims asserted, that the matters were fairly adjudicated, and that the factual findings which underlie the final judgment are deserving of our deference. Except for a need for further proceedings on one discrete issue, we affirm.

I

On the surface, this case gave all the appearance of a commonly-litigated General Equity case. Plaintiff Randy Goldberg alleged a number of theories for recovery but the action essentially consisted of his claim that he and defendant Robert Stolker had, in January 2009, formed an equally-owned, closely-held

2

entity named MYNJSOLAR, LLC. (the company). By November 2009, the parties' relationship had deteriorated and, in August 2010, Goldberg commenced this suit for a dissolution of the deadlocked company and for other relief.

The matter was tried over the course of approximately twenty days. The trial did not consist of consecutive trial days; to the contrary, those twenty trial days kicked off in August 2011 and ended an extraordinary twenty-one months later, in May 2013. In June 2013, the chancery judge went on the record on four separate days – June 11, 12, 27, and 28, 2013 – to express his findings of fact. On the last such occasion, which was also the judge's last day on the bench, he concluded he could not fully resolve the dissolution claim[1] by resorting to the evidence in the record. The judge's four-day June "decision" contains little more than his recognition of a need to divide the escrowed funds; he made no further attempt to resolve that problem and simply appointed a forensic accountant to figure it out. With that, the chancery judge rode off into retirement,[2] leaving for the next chancery judge the burden of bringing this suit to the finish line.

---

[1] The judge had previously dismissed all Goldberg's claims except his claim for the company's dissolution.

[2] Because the order was signed on the judge's last day on the bench, the parties were left with no meaningful opportunity to obtain clarification of what the judge intended.

In March 2014, the appointed accountant provided a report. The new chancery judge conducted various conferences to determine the means for adjudicating what remained. Despite differences of opinion as to how to proceed, the succeeding chancery judge decided she would hear the testimony of the accountant as the means of resolving the remaining disputes. That hearing occurred over two days in early January 2016, during which the judge also heard from two other witnesses. The accountant then provided a final report and, on April 18, 2016, the chancery judge placed her findings on the record. She determined that the accountant was the "most credible" witness she heard; consequently, the judge adopted the findings contained in the accountant's reports.

A final judgment entered on April 27, 2016, declared that after the payment of expenses the trust account held $201,080.77; the judgment directed that $34,297.22 be distributed to defendant Jared Kaban and the remaining $166,783.55 to Stolker. The judge also imposed an additional award in favor of Stolker and against Goldberg in the amount of $51,449.57.

Goldberg appeals from the final judgment, as does Stolker. In his appeal, Goldberg argues:

> I.   THE CHANCERY COURT ERRED IN RULING
> HOW THE ASSETS FROM THE DISSOLVED

A-4052-15T1

MYNJSOLAR COMPANY SHOULD BE DISTRIBUTED, WARRANTING REVERSAL AND REMAND.

II. THE CHANCERY COURT ERRED IN DISMISSING AS A MATTER OF LAW [GOLDBERG'S] CLAIMS FOR BREACH OF CONTRACT AND FIDUCIARY DUTY (COUNT 1), TORTIOUS INTERFERENCE (COUNT 2), NEGLIGENCE (COUNT 3), CONVERSION (COUNT 5), MISAPPROPRIATION (COUNT 6), UNJUST ENRICHMENT (COUNT 7), AND FRAUDULENT MISREPRESENTATION (COUNT 8).

A. [The First Chancery Judge] Erred by Denying [Goldberg] Leave to Obtain his Own Expert Accounting of the [Company].

B. [The First Chancery Judge] Erred in Quashing [Goldberg's] Subpoena on Bank of America Seeking Information Supporting [Goldberg's] Damage Claim.

C. Even Assuming, Arguendo, that [The First Chancery Judge] Did Not Err in Denying [Goldberg] Leave to Obtain the Expert and in Quashing the Bank of American Subpoena, [The First Chancery Judge] Erred in Ruling that [Goldberg] Failed to Show Sufficient Proof of Damages as a Matter of Law.

Stolker argues in support of his appeal:

I. THE TRIAL COURT ERRED IN NOT ADJUST-ING THE DISTRIBUTION FOR STOLKER'S RETURNING OF HELD SOLAR PANELS.

A-4052-15T1

II. [GOLDBERG'S] MULTIPLE VIOLATIONS OF RULE 2:6-1 AND RULE 2:5-3 [WARRANT THE COURT'S REJECTION OF THOSE ARGUMENTS OF GOLDBERG THAT ARE IMPACTED BY THOSE VIOLATIONS].

We previously granted a motion to consolidate these appeals and now reject all the parties' arguments except one, thereby affirming in part and remanding in part.

## II

To put our disposition of the issues posed in these cross-appeals in perspective and in their proper context, we outline the general factual circumstances that gave rise to this suit.

In January 2009, Goldberg and Stolker formed the company and agreed they would equally own and share its profits. In April 2009, Stolker brought in Kaban, his close friend and business partner, to work for the company.[3]

---

[3] At trial, both Stolker and Kaban testified that although there was no formal written agreement regarding Kaban's title or responsibilities, or his compensation, Goldberg was aware of Kaban's involvement in the business and agreed that as a result of Kaban's contributions, he was entitled to a percentage of the company's profits. But Goldberg claimed he did not want Kaban working there and that he was not fully aware of the extent of Kaban's involvement with the company. He also claimed that he never agreed Kaban should have an equity interest in the company or share in its profits. These disputed circumstances – as we will explain – were never resolved in the trial court, so we will remand

From here, we will discuss the relevant facts from the perspectives of Goldberg, Stolker, and Kaban.

## GOLDBERG

According to Goldberg, when the company was formed in January 2009, there was no written division of responsibilities between. Stolker's home office was the company's "business headquarters." Stolker provided Goldberg a key and the alarm code to his house.

They retained an attorney to form the limited liability company and draft for them an operating agreement. Goldberg signed the agreement but was not sure if Stolker ever did; nevertheless, they complied with the understandings contained in that document. Goldberg opened an account at Wachovia Bank for the company, listing only Stolker and himself as the company's owners and making only them the signatories to the account.

According to Goldberg, he: found an available name for the business; set up its website; figured out the sales process and a rudimentary way to perform a solar viability analysis (i.e., discover if the installation would work for each

---

for a disposition of that dispute and for an amendment of the judgment should the trial court's disposition of that dispute require an alteration of the previous adjudication.

A-4052-15T1

house); and determined the system size that would work and meet State requirements. At first, the business was all sales but by May 2009, the company started installing solar panels on customer's homes.

The record suggests that the genesis for their rift occurred when Stolker went away with his family for an extended period of time in the summer of 2009. According to Goldberg, Stolker did not tell him about his summer vacation plans when they first formed the company. Because of his absence, Stolker arranged to have Kaban get involved in the business to "try[] to do whatever he could do to make up for the fact that . . . Stolker was away."

Goldberg had previously met Kaban, and he knew Kaban had been a longtime friend and partner of Stolker in other business ventures. According to Goldberg, Stolker told him that he would take responsibility for compensating Kaban: "[D]on't worry, I'll take care of him. He's my responsibility. He's only filling in for me." Goldberg objected, but he could not prevent Kaban from entering Stolker's house, where the company office was located.

To Goldberg's knowledge, there was no written agreement regarding Kaban's involvement with the company, and Kaban was never formally employed. He was not sure what Kaban did for the company, as he claimed he

did not see much work product from him. In June 2009, Stolker got Kaban a company debit card without Goldberg's consent.

Goldberg also claimed that before Stolker left for his lengthy summer vacation, they spoke about changing the distribution from the original even split so Goldberg could obtain more of the profits. Goldberg claimed they had many conversations during which Stolker acknowledged Goldberg was doing more work and should take more money. According to Goldberg, Stolker "continually reinforced that principle over and over again." Goldberg understood from this that the amount of profits to which each of the parties were entitled rested in Goldberg's complete discretion. He believed he could take 100% of the profits if he wanted. This alleged agreement was never memorialized in writing or by email.

The company was busy in the summer of 2009. According to Goldberg, the business "did 60 percent of the total company installs during that time frame." He claimed neither Stolker nor Kaban helped him with those fifteen or sixteen installations. Stolker was aware of those jobs because he drove back from where he was vacationing approximately three times and discussed them with Goldberg. Kaban, according to Goldberg, did not help with the

installations, and Goldberg was so busy that he asked Richard Mundy, a friend and customer, for help.

Goldberg acknowledged that he went on a couple of sales calls with Kaban and admitted Kaban might have gone on some sales calls with Stolker. It would not have surprised him, Goldberg testified, if Kaban went on between three and twenty sales calls. Kaban also engaged in promotional events for the company, and Goldberg admitted he represented to prospective customers that Kaban was affiliated with the company.

Goldberg testified he tried to get Stolker more involved in the business when Stolker returned from his summer vacation, but Stolker "was once again completely uninterested." So Goldberg called for a meeting in November 2009. According to Goldberg's wife, Stolker yelled at Goldberg to give Kaban one-third of the company. Goldberg refused, and his wife testified she heard Kaban say he did not want one-third of the company.

The next day Goldberg told Stolker he did not want Kaban involved with the company. Stolker disagreed and threatened to call customers and tell them the company could not meet its obligations. Goldberg's "interpretation was [that] if I wasn't going to let Mr. Kaban into the company, [Stolker] was going to sabotage the company and in essence, destroy it." Goldberg claimed he felt

10

he had to acquiesce or let the company dissipate, but he adamantly refused to make Kaban a partner. And he claims he did not back down on the compensation issue, and that Stolker ultimately assured him that Kaban was his representative and he (Stolker) would take care of Kaban financially.

By November 2009, the relationship so deteriorated that the work was separated, with Goldberg handling installations and Stolker taking care of sales, although Goldberg did not recall any new sales during that time.

Goldberg recalled that Stolker told him they needed to sign a new bank signatory card because of some bank problem. The depository authorization and agreement certificate, which was admitted into evidence, listed Stolker as the company's owner, Kaban as chief financial officer, Goldberg as partner, and Andrew Mundy (a summer intern, who became a full-time employee) as manager, and the certificate provided all four with check signing authority. The certificate identified November 17, 2009, as the "Change Date," and provided that the change superseded all existing signature cards on file. Goldberg claimed he did not notice that the bank signatory card listed Kaban as chief financial officer; he insisted he did not agree that Kaban was authorized by the company to hold that position. Although Goldberg knew Kaban had check signing ability, he believed only that Kaban was Stolker's representative. Goldberg claimed not

to have had any conversations with Stolker or Kaban about changes to the company bank account, that he did not authorize those that were made, that he did not authorize Mundy to be added to the signatory card, and that when he learned about those changes, he attempted without success to undo them.

Goldberg also testified that when he and Stolker first formed the company, they agreed to install solar panel systems on their own houses and to pay regular customer prices. The company did an installation on Stolker's house in the summer of 2009, and Goldberg acknowledged Stolker paid for it. The company also installed systems on Goldberg's house, his mother's house in Monroe Township, and his in-laws' shore house on Long Beach Island; all were paid for. The purpose for doing those installations, according to Goldberg, was to promote the company and obtain business in new markets.

Goldberg explained that distributions were made to him and Stolker throughout 2009 and some also were made in 2010. According to Goldberg, there were numerous conversations in 2009 regarding distributions. Stolker told him he could take $300,000, shortly after the summer of 2009. At other times, Stolker said, "you're running the company, you're doing everything, do what you think is right." He identified during his testimony what purports to be an email,

dated June 12, 2010, from Stolker,[4] which expressed: "I have told you a number of times that you could take all the profits, I think I said 300,000, since you think you did all the work. And I meant it."

By mid-June 2010, Goldberg and Stolker were only communicating through Kaban. Goldberg claimed he lacked access to the company's files, records, or computer databases because the company office was in Stolker's house and Goldberg was not advised, as he soon discovered, that the alarm code had been changed. When trying to get into the company office, he noticed a solar box identified as a box installed by a company named Shooting Star Solar. Goldberg testified that, without warning, Stolker and Kaban formed competing solar companies named Shooting Star Solar, LLC and Turtle Solar, LLC.

At around the same time, and without discussion or agreement, Goldberg electronically sent a distribution check of $105,000 to himself, and one for the same amount to Stolker, from the company's Wachovia account. He claimed that he made those distributions because he had only just learned that the company's Wachovia account had been changed, and he therefore "no longer

---

[4] Stolker testified that he never sent such a thing, that he couldn't find it in his email account, and that later emailed communications and other documents strongly suggest that this email was inauthentic. The document was admitted into evidence but was apparently given little or no weight by the factfinder.

owned the bank account and . . . wanted to protect the assets." That left approximately $40,000 in the account.

On June 14, 2010, Goldberg withdrew $1000 from the company's Wachovia account and opened a bank account at TD Bank in the company's name. Neither Stolker nor Kaban were made signatories. Goldberg claimed he so acted because he feared the Wachovia account would be completely liquidated, leaving him unable to fulfill existing company contracts. Goldberg based this fear on the fact that there were withdrawals made from the Wachovia account for jobs of which he was not aware.

Goldberg transferred the approximately $30,000 that remained in the Wachovia account into the new TD Bank account and claimed he told Kaban a few days later. Stolker and Kaban also opened a separate company account at Bank of America on June 21, 2010. They did not tell Goldberg about this account.

Two days later, Goldberg emailed, instructing Kaban to cease and desist holding himself out as an employee or representative of the company. And a few days later, Goldberg's attorney sent a cease and desist letter to Kaban, again telling him he was not authorized to act on behalf of the company.

Goldberg's testimony also included information about two specific company projects. The first concerned Robert Tapper. Goldberg acknowledged that, in the summer of 2010, he retained significant equipment inventory from the Tapper project that belonged to the company. He admitted he retained fifty-four Kyocera solar panels, which were eventually used by his wife's solar energy company,[5] and that he never compensated the company for their use.

The second project concerned a customer named Tony Rosasco. In partial payment for his installation, Rosasco agreed to transfer the SRECs[6] produced by his system to the company; his contract listed the value of those SRECs at $46,797.50. Rosasco assigned them directly to Goldberg "[b]ecause," according to Goldberg, that was "the agreement [he] had with . . . Stolker through . . . Kaban in a conversation that we had." Goldberg acknowledged this alleged

---

[5] Lisa Goldberg, a therapist, owned her own solar energy business called Solar Engineering of New Jersey, which she started around August 2010. It was claimed that she owned this business by herself without partners.

[6] Goldberg explained that, under a State program, for every thousand kilowatts of clean energy produced, the State issued the owner a certificate showing that clean energy was produced; these were called Solar Renewable Energy Certificates (SRECs) that could be bought or sold: "SREC's are like a stock that you can save and trade . . . ."

agreement was undocumented. Goldberg also admitted he sold some of the SRECs for his own benefit.[7]

## STOLKER

Stolker testified he and Goldberg formed the company, giving themselves equal ownership interests and agreeing to equally share the profits. The certificate of formation, which memorializes that agreement, was not fully executed nor was it complete; the document lacked written stipulations as to how the company would be run.

At formation, the company became Stolker's full-time job. As a result, he dealt with the customers, went on all sales calls, and completed all required paperwork. Goldberg, on the other hand, had other employment and worked on company business mostly at nights and weekends. Before the company's formation, Stolker had a commitment to spend seven weeks, between July and August 2009, at a summer camp with his family. He told Goldberg about his commitment many times; Goldberg never voiced any objection.

---

[7] Goldberg failed to forward these funds or the SRECs received after August 26, 2010, to the attorney holding the funds that were to be distributed by way of this suit.

Stolker explained that he and Goldberg agreed at the outset that they should have company installations at their homes and agreed to pay proportional amounts for their systems based upon the cost to the company. Stolker's system, installed in the spring of 2009, was twice the size of Goldberg's, which was installed in the fall of 2009. So according to Stolker, he "should have paid exactly double what [Goldberg] paid"; in fact, Goldberg paid $20,250 for his system, and Stolker paid $77,500 for his.

In April 2009, Stolker brought Kaban into the business. He had known Kaban since 1988; they were close friends. According to Stolker, Goldberg was "absolutely" aware of Kaban's involvement and never voiced any objection. Kaban was involved in every aspect of the business and "became an integral part of our company." Not only was Goldberg aware of Kaban's involvement, Kaban worked "very closely" with Goldberg.

Originally, only Stolker and Goldberg could sign company checks. On June 19, 2009, however, Kaban was added as a signatory because he was taking care of the business accounts. Thereafter, Kaban signed most of the business checks. Goldberg was, according to Stolker, "absolutely" aware that Kaban was added to the account.

17

Stolker had Kaban sign a new signatory card which, unfortunately, had the unintended effect of removing Goldberg as a signatory. As a result, all three – Stolker, Kaban, and Goldberg – went to the bank to correct the mistake. Goldberg signed the card and never objected to Kaban being a signatory. Indeed, part of Kaban's responsibilities for the company was writing checks and paying bills, and Goldberg never objected when Kaban did those things.

According to Stolker, when his relationship with Goldberg began to deteriorate in the fall of 2009, Goldberg:

> just started demeaning me. It just became very frustrating for me because anything that I did just meant nothing and anything that he did no matter how little it was, was just everything. I did not like the way that [he talked to the interns] Andrew Mundy and Robert Mundy and Vicky Wang who were working there for the summer.

Stolker testified that at around the same time there was a "dramatic change" in the amount of work Goldberg was performing for the company. Goldberg complained about his responsibilities at his full-time job, and they discussed ending their business relationship. Stolker was not adverse but was not quick to pursue it because the company was doing well.

Stolker admitted that when he first brought Kaban aboard, there was no agreement or understanding between him and Goldberg about Kaban's

18

compensation. At the very beginning, Stolker "did say [he] would compensate [Kaban] out of [his] share." But that changed about six months after Kaban started working. In the fall of 2009, when Goldberg started decreasing his workload, they began discussing compensating Kaban from the company.

Goldberg understood that Kaban was not just helping Stolker, he was helping the company and needed to be compensated. Although not put into writing, Kaban and Golberg came to an understanding that Kaban would receive one-third of the profits. While Goldberg did not want to give Kaban a one-third interest in the business out of fear he could be outvoted by Stolker and Kaban, he knew Kaban had to be compensated and said to Stolker "that a third of the profits [for Kaban] was reasonable."

According to Stolker, at the November 2009 meeting at Goldberg's house, Goldberg never said he felt he was entitled to more money than Stolker. But, in late December 2009, Goldberg issued a company check to himself for $45,000. When Stolker asked, Goldberg told him that he wrote it to pay for the solar installation on his house so that he could get a thirty percent federal tax credit. Although Goldberg took the $45,000 disbursement, Stolker did not receive a similar disbursement; in fact he received no disbursement in 2009.

Prior to 2010, Goldberg never raised any question about the parties' equal ownership of the business, and the company's 2009 tax return listed Stolker and Goldberg as the sole and equal owners. The company's tax returns were prepared by an accountant who was a friend of Goldberg's.

In March 2010, Stolker learned that Goldberg had taken a distribution of $80,000 for himself while Stolker only received a $30,000 distribution. Stolker was furious and confronted Goldberg, who admitted he should not have done it. Goldberg said he would even out the distributions but never did.

In May 2010, Goldberg began emailing Stolker about ending their business relationship; Goldberg suggested they equally split the company, claiming this was generous because he had done more work than Stolker.

On June 14, 2010, Stolker learned that Goldberg had taken a $105,000 disbursement without first discussing it with him. Stolker went to the bank and withdrew $105,000 himself, leaving approximately $40,000, which they needed to complete ongoing projects. A week later, Stolker opened a separate company bank account at Bank of America and, later, Goldberg cleared out what was left in the company Wachovia bank account and deposited it into a TD Bank account. Stolker said he did not authorize that action.

A-4052-15T1

Stolker vehemently denied that he wrote the alleged email, referred to earlier, that purportedly contained Stolker's statement that Goldberg could take an additional $300,000 because Goldberg did more work for the company than he did. He claims the first time he saw that document was at his January 2011 deposition.

Stolker also testified about two specific company projects: those for Robert Tapper and Jeff Osowski. Tapper originally wanted a 30-kilowatt system, but only a 15-kilowatt system was actually installed, so only half the equipment ordered was used. Goldberg, according to Stolker, helped himself to the unused equipment: fifty-four solar panels, inverters, and mounting equipment. The company also reduced Tapper's contract price by $17,500, the amount of the State rebate Tapper would receive, provided that Tapper would assign the State rebate to the company. Without Stolker's consent, Goldberg assigned the State rebate to Tapper, leaving the company short $17,500 on the compensation due on that contract.

After suit was commenced, the court ordered that the company complete the Osowski contract, as well as a contract for a customer named Grillo; expenses needed to complete those contracts were to be paid from the escrowed funds. The Osowski installation occurred in September 2010. It turned out that

21

Osowski wanted a bigger system and different panels than originally agreed. Stolker advised Goldberg of the change but Goldberg refused to go along with releasing any of the escrowed funds needed to complete the project. As a result, Stolker and Kaban purchased the equipment through their own company, Shooting Star, LLC, to complete the project; the total price for this additional equipment was approximately $20,000. After the Osowski project was completed, Goldberg retained unused wire valued at approximately $1035.

Finally, Stolker testified that both he and Goldberg paid personal expenses through the company; he referred to these as personal draws. Stolker claimed these draws were similar in amount and essentially setoff each other.

## KABAN

Kaban testified to his friendship with Stolker since 1989. He spoke with Stolker about the solar company in December 2008 or January 2009, before the company was actually formed but didn't start working at the company until mid-April 2009. Prior to joining the company, Stolker told him that he would get "25% profit from the company," which Kaban found acceptable. Kaban did not know if Goldberg initially knew about the arrangement that he had with Stolker that he would receive twenty-five percent of the profits. Nevertheless, at some point Goldberg became aware and was in agreement that Kaban should get

22

twenty-five percent of the company's profits. Goldberg was present when Kaban arrived on his first day of work, saw him working at the company, and knew what he was doing there. Goldberg never objected.

As time went by Kaban's responsibilities increased; he began handling the company's finances and eventually became a signatory on its bank accounts. Again, Goldberg was aware of that and never objected. In fact, Goldberg regularly asked him to pay company vendors. Kaban also supervised the interns. He estimated that during the spring and summer of 2009, he and Goldberg went on between fifteen and twenty sales calls together.

In August and through November 2009, Kaban's responsibilities increased, and Goldberg asked him to do more. According to Kaban, Goldberg "was having a difficult time juggling his full time job" with company business, so he continually asked for help.

Kaban had a few meetings with Goldberg and Stolker about his compensation. Despite arguments, at one meeting, Goldberg agreed Kaban should have one-third of the profits.

In late May or early June 2009, Goldberg and Stolker both told him that since he went out on sales calls and was selling the company, he should also have a solar panel system installed on his house. While Kaban agreed, he did

not think that the company should make a profit off his system, and the three agreed he would get the system at cost; the system was installed in September or October 2009. Kaban paid $67,970, which consisted of $50,750 to the company and an assignment of his $17,220 rebate – the actual cost to the company, however, was $44,280. Kaban requested that he receive back the difference ($23,690) but never did.[8]

Kaban also testified about the Osowski and Grillo projects. He explained that the specifications on the Osowski project had changed and, since Goldberg would not authorize payment out of the escrow account, Stolker purchased the equipment necessary to complete the project. Similarly, Goldberg failed to consent to the purchase of equipment to complete the Grillo project, so Stolker and Kaban purchased the necessary equipment through Shooting Star; the total price for the equipment was $13,863.46.

### III

We consider first Goldberg's initial contention on appeal. Goldberg argues that the end-product of the case is infirm because the judge who heard

---

[8] Kaban explained that the three of them paid less than the actual contract price for the solar installations on their respective homes. The contracts were used to submit applications to the State; those contracts used a default price, but they all agreed to pay the cost to the company.

most of the evidence did not complete the trial and instead imposed on another judge – who had no opportunity to assess the credibility of the prior witnesses or gauge the weight of their testimony – the obligation to weigh additional evidence to complete the adjudication of the parties' disputes.

Our consideration of this problem requires more than a brief recitation of the procedural history of this case starting at the time the first judge partially decided the case and left the remainder for another judge.

## A

While recognizing the difficult position into which the second judge was placed, Goldberg argues that the ordering of a mistrial was the only choice available once the first judge retired. Our court rules, however, provide a remedy if a judge is unavailable to complete a trial. Rule 1:12-3(b) declares that "[i]f a judge is prevented during a trial from continuing to preside therein, another judge may be designated to complete the trial as if having presided from its commencement"; this subsection qualifies that authority by declaring that "the substituted judge [must] become familiar with the proceedings and all of the testimony therein through a complete transcript thereof." And subsection (c) of this Rule provides the substituting judge with the authority to determine whether the interests of justice simply will not bear the substitution:

> No substituted judge shall continue the trial in any matter pursuant to this rule unless satisfied, under the circumstances, that the judicial duties can fairly be discharged.  If  not so satisfied, the substituted judge shall  make  such  disposition  as  the  circumstances warrant, as where trial has taken place, by ordering a new trial or, in a case tried without a jury, by directing the recall of any witness.

Although these provisions do not expressly declare whether the authority to continue a trial with a new judge applies only to jury trials or includes bench trials, the last sentence of subsection (c) suggests that it encompasses both types of proceedings by providing the new judge with the option in a jury trial to declare a new trial but in a nonjury trial to recall witnesses as the judge's discretion suggests is necessary.  So, we reject the notion that the second chancery judge here was required to declare a mistrial.[9]

Goldberg appears to contend that a second judge, when deciding to carry on with a nonjury case without recalling witnesses, must describe on the record whether sufficient familiarity with the record and a reading of "a complete transcript" has occurred.  We reject any contention that a judge's failure to

---

[9]  The <u>Rule</u> does not reveal whether any part of this process may be followed in a  criminal matter.  Although the comments to our Court Rules suggest that the <u>Rule</u> also applies in criminal matters, Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 2 to <u>R.</u> 1:12-3 (2018), we need not now determine whether that is correct.

expressly declare that the entire existing transcript has been read is fatal. But we also recognize that Goldberg's point has greater subtlety. He contends that the record – through various statements by the second judge – establishes that the second judge did not fully familiarize herself with the trial transcript in the earlier proceedings before the first judge; consequently, Goldberg contends that the findings the second judge made were unreliable.

To be sure, the circumstances are troubling. A trial of a fairly run-of-the-mill deadlocked-closely-held-entity case – Chancery's version of a slip-and-fall case – was dragged out for twenty days over the course of two years. The first judge started taking testimony on August 23, 2011, and the trial ended on May 6, 2013.[10] The parties had thought, with their written proposed findings of fact and conclusions of law, that the matter had been fully submitted and the first judge would decide all the disputed issues. Instead, on four separate occasions in June 2013, the judge went on the record to express his findings, only to find fault with the parties' submissions. Ultimately, on June 28, 2013, the judge's

---

[10] We assume that is when the trial before the first judge ended because the June 28, 2013 order says so. No transcript from May 6, 2013 was provided to this court, but it also appears from the discussion during the trial that immediately preceded May 6 that it is not likely testimony was then taken. After oral argument, we inquired about this transcript and both sides acknowledged that no testimony was taken and the motion that was argued at that time has no bearing on the issues raised in these appeals.

27

last day on the bench, he declined to resolve the disputes based on the evidence presented but sought a recitation of the relevant information – or at least have the evidence packaged more simply than the way it unraveled through twenty days of testimony – through the services of a forensic accountant, whose report could not possibly be available to him by the time of his retirement. The judge – as the order he entered that day reflects – determined there was no merit to Goldberg's alternate theories of recovery and that the deadlocked entity should be dissolved; he anticipated that the forensic accounting would bring clarity to the various transactions that apparently clouded his ability to decide how the business's assets should have been divided. And with that, the judge retired.

The second chancery judge thereafter conferenced the matter. She apparently had a similar experience or two since taking over the chancery docket and expressed her understandable consternation:

> You know this is not the first time this has happened and I have a concern because what do I do? I mean, I'm thinking let's wait until we get this [forensic accounting] and se[e] if that can resolve everything. Because if not, I'll start the case again because I'm not going to listen to or read transcripts of somebody else's trial.
>
> [Emphasis added.]

All parties urged the judge not to start over, even though Stolker, who now contends there was no need for a do-over, recognized that the first judge only ruled on "certain issues" and failed to deal with "the real meat and potatoes of the case . . . before he retired." Goldberg's attorney at the time[11] also took the position with the second judge that she "would be able to resolve the matter" once the forensic accounting became available, because it would simply be a matter of "fill[ing] in the blank that should be filled in." The second judge committed to no particular course at that time, leaving it to the parties to advise of their positions once the forensic accounting was provided.

Things didn't improve. The parties were next in court a few months later because the report was not turned over due to Goldberg's refusal to pay the accountant; he claimed he should not be required to pay for work performed by the accountant that went beyond what he believed was called for. The parties also raised concerns about each having provided information to the accountant – as permitted in prior rulings – without being required to reveal to the other what had been provided. Ultimately, the judge directed that the accountant be paid from the escrowed funds, subject to a later reallocation if necessary, but she also, again, rhetorically asked how she was to enter "a judgment without

---

[11] Current counsel did not represent Goldberg at any phase of the trial.

hearing this case" and "how [could she] assess credibility of [the witnesses] by reading a transcript."

The parties were again before the court in April 2014 dealing with this nagging concern and the conundrum left by the first judge.[12]  Still "at a loss" as to how the case should proceed, the judge responded to Stolker's suggestion that she "read the transcripts":  "Absolutely not. . . . I don't know how I could possibly do that."  The judge also expressed her concern – understandable in light of the confused state in which the case was left after the first judge retired – "about what [still] has to be tried and what doesn't have to be tried."  No one claimed that the first judge's order, which was ostensibly intended to lay the groundwork for what followed, was "a model of clarity."  Contrary to what was argued earlier, Goldberg's new counsel took the position "that there's no other option but to start over."  Even Stolker's counsel, who remained adamantly opposed to any sort of do-over, expressed that "nobody . . . is happy with what [the first judge] did or didn't do here because he didn't finish" and seems to have just "r[u]n out of time" as he placed his final "findings" on the record on his last day on the bench.

---

[12]  Goldberg was represented by new counsel but, again, not the attorney now representing him in this appeal.

On this occasion, however, the second judge's view of how to proceed seemed to evolve from her earlier thoughts about starting over. The judge recognized it would be unfair to declare a mistrial when the first judge had heard testimony and, on the basis of that testimony, already dismissed portions of Goldberg's complaint. Instead, in managing the case on April 21, 2014, to a point where the remainder could be fairly adjudicated without wasting the proceedings that had previously occurred, the judge requested a motion from Stolker that would, after a response was filed, encapsulate those issues that remained unresolved.

The parties were next in court in August 2015. The new wrinkle then presented was the fact that the accountant, who had provided a report and been deposed, had expressed unease or unwillingness to further participate because Goldberg filed an ethics complaint against her.[13] By this time, the judge appeared to have rejected the notion of starting the trial over. Instead, and because clarity about the scope of the remaining issues still had not been achieved, the judge ordered a pretrial conference of the type described in Rule 4:25.

---

[13] Another wrinkle was the accountant's retirement, but she did not allow that to inhibit her participation. It was the ethics complaint that caused a temporary roadblock.

A-4052-15T1

The pretrial conference in September 2015 consisted of a direction that the parties' contentions and their delineation of the remaining issues would be incorporated in a pretrial order. The judge having determined not to start over was also adamant about her decision not to reconsider any issue the first judge had actually determined: "I'm not revisiting anything [the first judge] did." The trouble, however, was that there was a lack of clarity about exactly what issues were or weren't resolved in the earlier proceedings.

In any event, the judge heard the testimony of the accountant, as well as two other witnesses, over two days in January 2016. A week later, in advance of an anticipated amended accounting, the parties appeared in court to discuss the proceedings. During the colloquy – as now relevant to Goldberg's first point on appeal – his then (but not current) attorney emphasized not only Goldberg's repeated contention about certain issues that he believed had not been decided by the first judge, but also the need for the second judge to examine the entire transcript of the proceedings conducted by the first judge:

> I don't want to try the case again but I don't think you can decide this case without going back and reading the entire transcript to decide certain issues which just simply were not answered. That's my point.

The judge described her approach to the proceedings: she was not going to start the trial over and would "tr[y] [her] best to review as much [of the record] as [she] got."

The second judge rendered her findings of fact in April 2016, essentially endorsing the accounting after rejecting the persuasiveness of other testimony offered by Goldberg. The judge found the accountant "more credible." Consequently, the judgment described earlier was entered, followed by this appeal.

B

To be sure, these proceedings are no model on how to litigate such a case. And yet the case itself gives no appearance of having been particularly difficult or unusual. It has only been made difficult and unusual by the unduly protracted proceedings and the uncertain state in which it was left when the first judge retired.

Chancery judges manage their own calendars, possessing the authority to flexibly jump from case to case depending on the needs of the entire docket; some cases require immediate attention, others may proceed at a more leisurely pace. With the demands posed by numerous emergent and unexpected applications, and with the burden of resolving the great variety of case types in

33

a timely fashion, chancery judges often must practice triage in the docket's management. At times, a bench trial may have to be paused and resumed as necessary to meet all the other demands placed on a chancery judge, who, in many vicinages – such as this one – toils alone. But these facts of life in General Equity should rarely lead to a trial with so many lengthy interruptions.

This record readily demonstrates how the languid pace of a trial may burden or impede a suit's fair and complete adjudication. The first judge's approach of allowing such large breaks in the proceedings ultimately led to a hurried and incomplete resolution nearly two years after the trial started. And because this undesirable process led to an incomplete disposition, an extraordinary burden was placed on the next judge – a complete stranger to the case – to attempt to accomplish what the first judge hadn't. In fact, in many ways, the first judge's disposition posed more questions than it answered, as we have outlined in our brief discussion of the proceedings that followed when the second judge picked up the baton.

But, having recognized the process was far from ideal, we see no deprivation of due process nor can we conclude that what occurred should call into question the adequacy of the second judge's disposition of the issues she decided. Although, as appears to be an element of Goldberg's argument, the

A-4052-15T1

judge never actually verbalized that she read all the existing transcripts of the trial proceedings that preceded her involvement, as in Hyland v. Kirkman, 204 N.J. Super. 345, 352 (Ch. Div. 1985) (where a judge heard all the testimony but was unable to render a decision before he died), that was not fatal to the validity of the following proceedings. From all that she said, we are able to conclude that the experienced second judge fully familiarized herself with the prior proceedings to the extent relevant to what remained. We do not view Rule 1:12-3 as imposing a hard-and-fast rule in a situation like this, where the first judge at least rendered some partial dispositions before retiring; in that instance, the succeeding judge was not obligated to read the entire record but only those parts still bearing on the remaining issues.

C

The larger question that concerns us is whether any unresolved issues were lost in the hand off from judge to judge. With one exception, we think not.

There is no question that the June 28, 2013 order – the order that ended the first judge's involvement – declared that all Goldberg's claims, except his claim for dissolution of the company, had been dismissed. Indeed, those other claims were involuntarily dismissed on March 29, 2012, during the course of the

first trial.[14] The June 28, 2013 order identified as remaining only the dissolution claim, as well as some of the claims contained in the counterclaim (others were dismissed), and "claims regarding the Grillo [and] Osowski contracts." The order went on to provide parameters for the appointment of a forensic accountant that included a direction that the accountant's report "include recommended findings [on nine matters]"; three of those subparagraphs called for the accountant's "analysis" of net results of the Grillo and Osowski contracts, the Rososco contracts, and "the Tapper equipment and rebate." And then the judge wrote, apparently as a means of catching anything that might fall through the cracks, that "all other open issues [were] to be resolved after receipt of the accountant's report." Perhaps the judge was just being cautious or perhaps he simply envisioned that these litigious parties would find matters in the accounting to dispute when he recognized the possibility of other "open issues."

This June 28, 2013 order set the parameters for what was left to be decided, and we recognize that the second judge stuck to that script; she viewed any other issues as having been resolved or foreclosed by that order or by the

---

[14] We are mindful that the earlier partial involuntary dismissal has been raised as an error for us to consider here. We examine those issues later in this opinion.

first judge's earlier rulings. With one exception, we agree that what was not decided by the first judge was encompassed by the second judge's decision.

We also find no reason to intervene in the second judge's disposition of those issues she determined were before her. Contrary to Goldberg's arguments, a broader issue about the distribution of the assets – that is, Goldberg's claim that he was entitled to all the escrowed funds – was not in issue. Had the first judge found that assertion to be true, there would have been little need for the proceedings that followed. We agree that once determinations were made as to what money was put into the business and what was taken out and by whom, it was left for the court to equally divide the assets. The second judge heard testimony from: the accountant; Gary Lakritz, who purchased SRECs from Goldberg; and Tony Rosasco, who contracted with the business for the installation of a solar panel system.

The judge weighed and considered this evidence and resolved the pending issues. She first found the accountant's testimony about the inventory of SRECs and its value to be more persuasive than what Lakritz suggested. She also found Rosasco's testimony lacking in credibility. The judge found the accountant "to be most credible" and ultimately concluded, in considering which deductions

were personal and which were business related, that the remaining assets be divided pursuant to the accounting provided.

After all the "sturm und drang" about these issues, our role is simply this. Having concluded that the second judge properly approached the scope of her role following the retirement of the first judge, we must simply determine whether the second judge's findings are entitled to deference. And, having undertaken a thorough analysis of the record, we conclude they are. The judge had the opportunity to consider and weigh the credibility of the witnesses during the January 2016 proceedings, not us. So long as the judge's findings were based on evidence in the record – and they were – our obligation is to defer to those findings. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974).


IV

Goldberg also argues that the second judge failed to resolve issues that were not decided by the first judge. For example, Goldberg argues that the first judge failed to determine whether Kaban did or did not demonstrate an ownership position in the business and the disposition of the remaining issues by the second judge also failed to include such a determination. Goldberg contends there also never was a disposition of certain other factual disputes.

Goldberg chiefly argues that the court never resolved his claim that Stolker agreed or that he was equitably entitled to a greater share of the profits than Stolker.

With the exception of the issue regarding Kaban's alleged interest in the company, we reject the parties' arguments about what remained to be decided after the first judge's retirement. As for those other issues, we note that, although not expressed with the clarity one would hope, the first judge's determinations – including his dismissal of the theories of recovery beyond the parties' entitlement to the dissolution of the company, such as the breach of contract and fiduciary duty, misappropriation, and unjust enrichment – encompassed a rejection of Goldberg's theories on those other matters. Indeed, as Stolker forcefully and correctly contends, if the first judge had agreed that Goldberg and Stolker reached an agreement calling for Goldberg's entitlement to those profits or could dispose of them in any manner Goldberg unilaterally saw fit, then there would have been no reason for that judge to appoint an accountant to ascertain a division of the company assets; in other words, if the judge accepted Goldberg's contention, he would have simply ordered a turnover to Goldberg of all the escrowed funds. In short, although not always expressly stated, we are

satisfied that the trial court findings implicitly encompassed the claims Goldberg argues remain undecided.

This does not, however, account for the claim regarding Kaban's alleged interest in the company. The parties' testimony sharply differed on this point, and we cannot locate in either judges' findings even an implicit determination of that question. Consequently, we are constrained to remand for a determination of whether or to what extent Kaban had an interest in the company.

Otherwise, we conclude, after careful analysis of the record that both parties' contentions about unresolved factual disputes are without merit. To the extent we have not specifically addressed some of their contentions, it is because we find they have insufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

V

Goldberg also argues that the first judge erred in involuntarily dismissing all his claims other than his claim for the company's dissolution. We reject this argument.

Rule 4:37-2(b) permits an involuntary dismissal when a consideration of the facts and the applicable law demonstrate that the claimant "has shown no

right to relief." The Rule requires the motion's denial "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b); Dolson v. Anastasia, 55 N.J. 2, 5 (1969). The "judicial function," upon the filing of such a motion, is "quite a mechanical one" and concerns itself not with "the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Id. at 5-6.

In reviewing such a disposition, we apply the same standard. Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014). Under that standard, "[a] motion for involuntary dismissal only should be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008); Pitts v. Newark Bd. of Educ., 337 N.J. Super. 331, 340 (App. Div. 2001).

With the exception of the dissolution claim, the first judge dismissed all Goldberg's theories of recovery pursuant to this Rule. He determined that Goldberg failed to prove he sustained any quantifiable damages because all of the funds possessed by the company ended up in the escrow account. In other words, whether any money received on behalf of the company was commingled

into Stolker's personal account or the Shooting Star account is irrelevant because, as the judge determined, all that money ended up in the escrow account. There was no evidence to the contrary. The appointed accountant, who the second judge found credible, later confirmed this.

The ruling was also based on the fact that Goldberg was not qualified to testify about prospective damages or lost future profits – a subject matter requiring expert testimony, as beyond the ken of the average juror. See Butler v. Acme Mkts., Inc., 89 N.J. 270, 283 (1982). Goldberg, however, was unable to establish he sustained any actual damages because, even if he could prove prima facie claims on these other theories – namely, breach of contract and fiduciary duty, tortious interference, negligence, conversion, misappropriation, unjust enrichment, and fraudulent misrepresentation – any and all money related to the company ended up in the escrow account and was available to the extent Goldberg was entitled to relief on his dissolution claim.

## VI

Goldberg contends the first judge abused his discretion by (a) denying his mid-trial request for an opportunity to obtain expert testimony, and (b) in quashing subpoenas he served during trial. We find insufficient merit in

Goldberg's arguments to warrant further discussion in a written opinion, R. 2:11-3(e)(1)(E), and only briefly and separately discuss these two assertions.

A

As to the first of these, Goldberg argues:

> The litigation was long and drawn out already. When plaintiff moved for leave, the Chancery court had heard only three partial days of trial testimony out of what turned out to be more than twenty days of testimony. When [he] moved for leave to obtain the expert, the next court date was three months away.[15] No delay would have been caused by allowing [Goldberg] to secure the testimony from the accounting expert who was already identified and secured by [his] counsel.

We reject this contention.

A judge's right "to manage the orderly progression of cases before it has been recognized as inherent in its function." Casino Reinvestment Dev. Auth. v. Lustgarten, 332 N.J. Super. 472, 488 (App. Div. 2000). The mid-trial application essentially sought to reopen discovery and undoubtedly would have had a profound effect on the trial. The judge's decision to prevent Goldberg from delaying the proceedings in this fashion was a matter well within his discretion and not one that we will second guess.

---

[15] Not that it matters, but the next scheduled trial day was two months away, not three.

Even if sought prior to trial, we still would examine the discovery request through the application of a deferential standard. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011). We "generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

But extensions of discovery or a late request for the providing of an expert report are forbidden once a trial date is set absent exceptional circumstances. R. 4:24-1(c). A moving party must demonstrate "legitimate problems beyond mere attorney negligence, inadvertence or the pressure of a busy schedule." Pressler & Verniero, cmt. 3 to R. 4:24-1. Goldberg's argument is not persuasive. The

judge would have been correct to view it skeptically if filed on the eve of trial, let alone after the trial commenced.[16]

We are mindful that even though the case proceeded at a snail's pace, the granting of Goldberg's late request would have delayed this matter even further. Whatever Goldberg might have come up with if the request was granted, in fairness, Stolker would have been entitled to depose the expert and, if he felt it necessary, retain his own expert to rebut whatever Goldberg provided.

For these reasons, the judge did not abuse his discretion in denying Goldberg's extraordinary mid-trial request to obtain an expert.

---

[16] Goldberg's reliance on Tucci v. Tropicana Casino, 364 N.J. Super. 48 (App. Div. 2003), is misplaced. In that case, the expert report was untimely but submitted well before trial. Id. at 52. We also pointed out that the plaintiff's attorney "reasonably relied on the cooperation of his adversaries who made no objection to the expert's inspection" after the submission deadline. Id. at 53. And we noted that "plaintiffs' attorney's personal situation by reason of his mother's terminal illness and death provided good cause, if not extraordinary circumstances, mandating a reasonable modicum of judicial indulgence." Id. at 54. Unlike Tucci, the report here was not even sought by the proponent until after the trial had begun, and no extraordinary circumstances existed which would mandate even a modicum of judicial indulgence. See Huszar v. Greate Bay Hotel & Casino, Inc., 375 N.J. Super. 463, 474 (App. Div. 2005) (holding no exceptional circumstances exist to warrant an extension of discovery when "the delay rests squarely on plaintiff's counsel's failure to retain an expert and pursue discovery in a timely manner").

B

Goldberg also contends that the judge abused his discretion by granting Stolker's motion to quash a subpoena served on Bank of America. He argues that "[t]he subpoena directed to Bank of America was properly calculated to discover evidence on this central issue of whether Stolker misappropriated . . . company funds for his personal benefit," a request he believes fell within the scope of discoverable information under Rule 4:10-2(a). We disagree, largely for the reasons already discussed, that the judge should have permitted that untimely attempt to reopen discovery.

The appellate record reveals that, on October 24, 2011, during the course of trial, Goldberg served on Bank of America a subpoena duces tecum and subpoena ad testificandum for the bank records of the company, as well as Shooting Star's and Stolker's bank records. This motion was denied because the service of the subpoena was found untimely. For the reasons that properly negated Goldberg's untimely attempt to secure expert testimony, expressed in the section above, this application was properly denied. "No extension of the discovery period may be permitted after an arbitration or trial date is fixed, unless exceptional circumstances are shown." R. 4:24-1(c). When Goldberg issued the subpoena, the trial had already begun and no exceptional

46

circumstance to permit this discovery – even if the trial had not already started – was shown.  See Huszar, 375 N.J. Super. at 475.

VII

We remand for further proceedings about the allegation that Kaban was entitled to an interest in the company and, if so, for an ascertaining of that interest and a modification of the judgment to the extent any such findings require.  We hasten to add that, despite the time and efforts in the trial court that preceded this appeal, we see no reason why the proceedings that follow should be anywhere near protracted.  So there is no question, we direct that the remand proceedings necessitate the recalling of those witnesses who testified about this particular issue; the matter is one that largely rises and falls on the credibility of those witnesses and the judge to whom this matter now befalls[17] cannot possibly make that credibility finding by resort to the transcripts.  The judge must see and hear those witnesses testify.  Although we do not impose any restrictions on the consideration and determination of the remaining issues, from our review of the record we are convinced that the testimony required on those issues could be elicited in a brief period of time, certainly in a day or less.

---

[17]  The second judge retired during the pendency of this appeal.

A-4052-15T1

Affirmed in part; remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION